CONTEMPORARY MISSION, INC., Reverend Patrick J. Berkery, Reverend Robert J. Cassidy, Reverend John F. Coyne, and Reverend John T. O'Reilly, Plaintiffs–Appellants,

v.

The NEW YORK TIMES COMPANY, Defendant–Appellee.

No. 574, Docket 87–7666.

United States Court of Appeals, Second Circuit.

Argued Jan. 21, 1988.

Decided March 16, 1988.

remedies, *Nebraska Press* indicates that an analysis of the effectiveness of the order in question is a necessary consideration. The effectiveness of the restraining order here does not affect the validity of the order, as it did in *Nebraska Press,* where the order was limited geographically and jurisdictionally. There, outside press could report fully on any information obtained from anyone. Here, in contrast, the restraining order being directed at trial partici-

pants is undisputably effective. In this sense, no lack of efficiency of the restraining order weighs against its imposition, as was the case in *Nebraska Press.* On the other hand, devising the most effective preventive measure is not the proper goal. Rather, the goal is to craft measures to ensure an impartial jury without restricting First Amendment rights any further than absolutely necessary.

Father John T. O'Reilly, pro se (Kenneth R. Davis, William D. O'Reilly, Stamford, Conn., of counsel), for plaintiffs-appellants.

John G. Koeltl, New York City (Debevoise & Plimpton, James C. Goodale, Edwin

G. Schallert, New York City, of counsel), for defendant-appellee.

Before FEINBERG, Chief Judge, TIMBERS and KEARSE, Circuit Judges.

FEINBERG, Chief Judge:

Contemporary Mission, Inc., a not-for-profit organization of Catholic priests with its principal place of business in Connecticut, and four of its member priests—Father Patrick J. Berkery, Father Robert J. Cassidy, Father John F. Coyne and Father John T. O'Reilly (collectively, the priests)—appeal from a judgment of the United States District Court for the Southern District of New York, Vincent L. Broderick, J., dismissing, on motion by The New York Times Company (the Times) for summary judgment, appellants' defamation action against the Times. The action was based upon an article in the November 1, 1980 edition of *The New York Times* (the *Times*) entitled "Westport Priests Beset by Church and U.S. on Status". For the reasons given below, we affirm the judgment of the district court.

## I. Background

The underlying facts of this case, which are described in greater detail in Judge Broderick's thorough opinion reported at 665 F.Supp. 248 (S.D.N.Y.1987), can be summarized as follows. On November 1, 1980, the *Times* published an article, written by *Times* reporter Diane Henry, which described certain religious and business controversies involving Contemporary Mission and its member priests. The article stated that the priests, who were living in Westport, Connecticut, "with all the trappings of wealth," had until recently been "supporting themselves with a large tax-exempt mail-order business" offering various self-improvement products. The article stated that the priests' religious status was being challenged by officials of their own church and by several governmental agencies. It addressed, among other things, (1) recent challenges by the Internal Revenue Service, the United States Postal Service and the State of Connecticut to Contemporary Mission's mail-order business; (2) allegations made nearly a decade earlier that documents submitted by three of the priests in support of their 1971 ordinations had been forged; and (3) questions concerning the priests' current religious status.

Shortly after publication of the article, appellants brought this diversity action seeking $20 million in damages. After a series of amendments to their complaint, appellants ultimately challenged the following 14 statements in the *Times* article as libelous (the quoted language is taken verbatim from the second amended complaint):

1. Church officials in St. Louis, led by John Cardinal Carberry, accused the priests [of the Mission] of forging documents for their ordinations.

2. In a recent interview, Msgr. Andrew T. Cusack, an official with the Bridgeport (Ct.) Diocese, which now has jurisdiction over the mission (sic) priests, said they were 'inactive' and 'seeking reconciliation.' In a letter to the Government, he also said they were not recognized by the diocese and were 'unable to function as Catholic priests.' But the Postal Service says it has another letter, allegedly sent by the monsignor, that says 'their ordination and current canonical efforts have the full recognition of the church.' The monsignor has denied writing that letter.

3. But in 1977, the State of Connecticut got a cease and desist order against them for failing to deliver merchandise.

4. Ordinations Called Forged.[1]

5. The group's activities prompted some church officials to call them clerical dilettantes, and Cardinal Carberry refused to ordain them. Father Berkery had already been ordained, and the others were ordained in 1971 in Connecticut by a visiting Bishop from Ghana.

But that same year the Bishop, the Most Rev. Peter K. Sarphong (sic) later wrote to the Vatican saying he had been 'misled' when he accepted documents

---

**1.** This phrase appeared as a subhead in the text of the article.

supporting the ordinations of the priests, which St. Louis officials said had been forged.

The mission priests disclaimed knowledge of the forged documents, and they accused Cardinal Carberry, who is now retired, of conducting a smear campaign against them.

Since then the priests have been in a kind of canonical limbo, and it is difficult to clearly determine their status.

6. In a separate action, the Postal Service charged them with fraud in the bath-oil sales.

7. As evidence of the honesty of their operation, the priests point to a Federal report saying the United States Attorney's office in Connecticut had declined, in January 1979, to prosecute charges of mail fraud against them because "the firm does supply the products in most instances."

8. Father O'Reilly later married the lead singer in the touring company and is now divorcing her.

9. Under normal circumstances, Father O'Reilly's marriage would mean his automatic excommunication from the church, according to experts on canon law. But Father O'Reilly said he had switched to the Eastern Rite of the Catholic Church, which allows married priests.

10. Five Roman Catholic priests whose religious status is being challenged by officials of their own church, as well as by three Federal agencies, say they have been misunderstood and harassed because they are unconventional clerics.

11. The priests, who insist they are not rich, argue that there is no law prohibiting churches from running a mail order house, that they run an honest business and have used the money to finance their work. Yet the Mission's vast public court record with the Government, individuals and corporations raises questions about whether the priests may have cloaked a profitable business in the guise of a religious, tax-exempt organization.

12. The priests say that Mission is a pious society and that its members perform all traditional priestly functions and good works, but other priests contradict them.

13. In St. Louis a decade ago, the seminarians dreamed of using profits from their musical talents to support their labors for the poor.

14. Father O'Reilly and Father Berkery said they had conducted many services at St. Catherine's Church in Greenwich, but the pastor of the church, the Rev. Vincent J. O'Connor, contradicted them.

The allegations made by appellants with respect to these statements are discussed below.

In July 1987, Judge Broderick ruled on various motions pending before him. He denied the Times' motion to dismiss new claims in the second amended complaint on statute of limitations grounds, holding that adequate notice had been given by appellants' original complaint so that the second amended complaint related back to the time of the commencement of the action. The judge also denied appellants' request for additional discovery pursuant to Fed.R. Civ.P. 56(f). Addressing the merits of the Times' summary judgment motion, the court determined that statements 2 (in part), 3, 6, 7, 8, 9 and 13 were either not defamatory or not false or both. The judge also held that appellants were limited purpose public figures with respect to the religious and business controversies described in the article and therefore appellants could not recover unless there is "clear and convincing proof" that the article was published "with knowledge of its falsity or with reckless disregard for the truth." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed. 2d 789 (1974). Judge Broderick granted the Times' motion for summary judgment as to all of appellants' claims and dismissed the complaint. The judge concluded that appellants had "not offered a scintilla of evidence to satisfy their burden of proving that the Times *knew* that the statements it published were false.... Plaintiffs have simply not shown that the Times 'enter-

tained serious doubts about the veracity of the publication,' or that there were signs which should have tipped the Times off to any blatant inaccuracies in the article." 665 F.Supp. at 270 (emphasis in original). This appeal followed.

## II. Discussion

### A. *Appellants' Status as Limited Purpose Public Figures*

We must first consider whether Judge Broderick correctly determined that appellants were limited purpose public figures with respect to the challenged statements. Appellants' status as public or private figures determines the standard of fault that appellants must establish to succeed on their claims. In *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964), the Supreme Court held that a state cannot award damages to a "public official" for defamatory statements concerning his official conduct absent a showing that the statements were published with "actual malice." This standard was extended to "public figures" in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 162–63, 87 S.Ct. 1975, 1995–96, 18 L.Ed.2d 1094 (1967) (Warren, C.J., concurring), and in *Gertz*, 418 U.S. at 352, 94 S.Ct. at 3013, the Court indicated that parties who are not public figures for all purposes may still be public figures with respect to a particular controversy. In *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) five members of the Supreme Court (in three separate opinions) indicated that to apply the "actual malice" standard under *Gertz* a court must also determine that the contested statement is a matter of public concern.

In *Gertz*, the Court determined that the plaintiff there, a lawyer tangentially involved in the prosecution of a policeman, was not a limited purpose public figure in connection with the controversy surrounding the prosecution because he had not "thrust himself into the vortex of [a] public issue, nor did he engage the public's attention in an attempt to influence its outcome." 418 U.S. at 352, 94 S.Ct. at 3013.

In subsequent cases, the Supreme Court has held that (1) the fact that a wealthy woman sought to obtain a divorce did not make her a limited purpose public figure, *Time, Inc. v. Firestone*, 424 U.S. 448, 454–55, 96 S.Ct. 958, 965–66, 47 L.Ed.2d 154 (1976); (2) refusal to appear before a grand jury in a case likely to attract publicity did not make one a limited purpose public figure, *Wolston v. Reader's Digest Assn., Inc.*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979); and (3) receipt of Senator Proxmire's Golden Fleece Award by the recipient of federal research funds did not make the recipient a limited purpose public figure, *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979). The key inquiry in each case concerned "the nature and extent of [the] individual's participation in the particular controversy giving rise to the defamation." *Gertz*, 418 U.S. at 352, 94 S.Ct. at 3013; *Wolston*, 443 U.S. at 167, 99 S.Ct. at 2707.

In *Lerman v. Flynt Distributing Co., Inc.*, 745 F.2d 123, 136–37 (2d Cir.1984), cert. denied, 471 U.S. 1054, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985), this court set forth a four part test for determining whether someone is a limited purpose public figure:

A defendant must show the plaintiff has: (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.

Applying that test to the facts in *Lerman*, we determined that a well-known author whose books and screenplays dealt extensively with issues of sexual mores was a public figure for the limited purpose of commenting on sex and nudity in films. Id. at 137.

In this case, Judge Broderick determined that appellants had not achieved the "pervasive fame or notoriety" necessary to be characterized as general purpose public figures. 665 F.Supp. at 263–64. He concluded, however, that appellants had become

limited purpose public figures with respect to the subject matter of the challenged statements. Judge Broderick divided the statements into two broad categories: (1) those dealing with the religious controversy surrounding the priests' ordinations and their status as priests; and (2) those dealing with the business controversy surrounding Contemporary Mission's mail-order business. The judge concluded that appellants may properly be characterized as limited purpose public figures with respect to both the religious and business controversies. We agree.

■ Appellants were plainly limited purpose public figures with respect to the religious controversy surrounding them in the early 1970's. The record contains undisputed evidence that the priests voluntarily injected themselves into the public controversy surrounding the 1971 ordinations. Appellants openly invited media attention during this period of their careers. In the late 1960's, several members of Contemporary Mission formed a nationally known folk-rock group called The Mission Singers. The group produced 18 record albums, gave more than 200 concerts in over 38 states and appeared on numerous television and radio shows, including television shows such as the Ed Sullivan Show, the Mike Douglas Show and the Joey Bishop Show. "Virgin," a rock-opera written by Father O'Reilly, sold 20,000 copies. Appellants also published a syndicated column in over 50 newspapers for two years and published numerous books and articles on contemporary religious life. In 1968, when appellants left the Montfort Fathers in St. Louis in a dispute over instruction at the seminary, their departure was "publicized by nationwide and worldwide news wire services" because, according to Contemporary Mission, of "the fame and popularity" of the group's musical efforts.

When appellants left the Montfort Fathers, Father Cassidy, Father Coyne and Father O'Reilly had not yet been ordained, and over the next three years they contacted approximately 30 bishops seeking one who would ordain them. In 1971, Bishop Peter Sarpong of Ghana ordained the three priests in Cromwell, Connecticut. The ordinations attracted substantial media attention, which was intensified when the *St. Louis Review,* an Archdiocesan newspaper, published allegations that documents submitted in support of the ordinations had been forged. Allegations by church officials in St. Louis, where the priests then resided, and counter-allegations by the priests were widely reported by the press. Over 200 news articles about appellants from more than 60 different publications located in over 15 different states, a substantial portion of which addressed the controversy surrounding the ordinations, were submitted to the district court by the Times as part of its summary judgment motion.

Appellants openly availed themselves of the media, issuing press releases, making public statements and addressing "open letters" to Cardinal Carberry of St. Louis. Portions of an open letter addressed to Cardinal Carberry dated August 3, 1971, illustrate the public nature of the controversy:

Thank you for doing so much recently for us members of the Contemporary Mission. Thanks to you, we have now become celebrities, almost household words. All the publicity you've given us—free of charge!—has helped our group immensely. We've been on so many radio talk shows, we've done so many television interviews in depth, that we can no longer keep track of it all....

We would also like to thank you for the thousands of dollars of free publicity you gave us in three issues of your house organ, the St. Louis Review....

Your little hoax about the allegedly forged letters was priceless. You attempted to implicate us in the forgery, but let's be honest: it seems more probable that *you* either fabricated those letters or else intimidated the authors enough so they would deny them. Why you? Because *we* couldn't have been responsible. You apparently know this well, as you haven't charged us with a thing. Instead, you use the old trick of planting the letters and then innocently letting people draw their own conclusions. Except you forget that the aver-

age person is too sophisticated not to spot a frame-up.

Appellants argue that even if the publicity accompanying the ordinations constituted a public controversy into which each appellant voluntarily injected himself in the early 1970's, the matter is no longer a continuing public controversy. They stress that there has been a dearth of publicity concerning this matter in recent years and allege that since 1974 none of the appellants has sought or initiated any publicity with respect to this or any other matter. The district court found that there have been no media appearances by any members of Contemporary Mission since 1974 and The Mission Singers are no longer active. 665 F.Supp. at 253.

Appellants argue that they have "succeeded for the most part in returning to ... private life." *Wolston,* 443 U.S. at 163, 99 S.Ct. at 2705. This assertion is largely belied by the fact that they continued to thrust themselves into the public eye through the conduct of Contemporary Mission's business activities and have been involved in at least 35 other lawsuits since 1974, including several before this court, see, e.g., *Contemporary Mission, Inc. v. Bonded Mailings, Inc.,* 671 F.2d 81 (2d Cir.1982); *Contemporary Mission, Inc. v. United States Postal Service,* 648 F.2d 97 (2d Cir.1981); *Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918 (2d Cir.1977); *Robert Stigwood Group Ltd. v. O'Reilly,* 530 F.2d 1096 (2d Cir.), cert. denied, 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976). Moreover, in *Wolston,* the Supreme Court explicitly reserved the question of "whether or when an individual who was once a public figure may lose that status by the passage of time." 443 U.S. at 166 n. 7, 99 S.Ct. at 2706 n. 7.

This court has previously indicated that the passage of time will not necessarily change an individual's status as a public figure. In *Meeropol v. Nizer,* 560 F.2d 1061, 1066 (2d Cir.1977), cert. denied, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978), the children of Julius and Ethel Rosenberg were found to be general purpose public figures because they were "cast into the limelight" during the Rosenberg trial. The court assumed, *sub silentio,* that the children's status as public figures continued some 20 years after the trial for the purpose of a libel action based upon a book published in 1973 containing commentary on the Rosenberg trial. Similarly, in a case preceding *New York Times* and *Gertz,* this court held that a child prodigy who was once a public figure remained a public figure years later even though he had since "cloaked himself in obscurity," because "his subsequent history, containing as it did the answer to the question of whether or not he had fulfilled his early promise, was still a matter of public concern." *Sidis v. F–R Publishing Corp.,* 113 F.2d 806, 809 (2d Cir.), cert. denied, 311 U.S. 711, 61 S.Ct. 393, 85 L.Ed. 462 (1940). Other courts have concluded that an individual who becomes a limited purpose public figure with respect to a particular controversy retains that status for the purpose of later commentary on *that* controversy. See *Street v. National Broadcasting Co.,* 645 F.2d 1227, 1235–36 (6th Cir.), cert. granted, 454 U.S. 815, 102 S.Ct. 91, 70 L.Ed.2d 83, cert. dismissed, 454 U.S. 1095, 102 S.Ct. 667, 70 L.Ed.2d 636 (1981); *Holt v. Cox Enterprises,* 590 F.Supp. 408 (N.D. Ga.1984). Cf. *Brewer v. Memphis Publishing Co.,* 626 F.2d 1238, 1256–57 (5th Cir. 1980), cert. denied, 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 973 (1981) (involving a general purpose public figure).

The public figure doctrine is based upon "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open...." *New York Times,* 376 U.S. at 270, 84 S.Ct. at 721. This commitment is balanced against the state interest in compensating private individuals for wrongful injury to reputation. In *Gertz,* the Supreme Court declined to extend the *New York Times* standard to defamation actions brought by private individuals. The Court's rationale for distinguishing between private and public figures was twofold. First, the Court noted that private figures are more vulnerable to injury from defamation, since public figures have greater access to the media and thus are in

a better position to contradict a lie or correct an error. 418 U.S. at 344, 94 S.Ct. at 3009. Second, and more important, public figures generally "have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them." Id. at 345, 94 S.Ct. at 3010. Applying this rationale, we conclude that appellants' limited purpose public figure status has not dissolved with the passage of time. While appellants' access to the media may have declined somewhat with time, they invited public attention and comment by thrusting themselves into the forefront of the religious controversy and thereby accepted the risk of increased exposure to defamatory falsehoods. We see no reason why, in this case, the media's treatment of the religious controversy should be subject to a different standard in 1980.

■ The district court determined that appellants had not thrust themselves into the forefront of the controversy surrounding the investigation of their business activities, since they had not utilized the media to further their points of view or to sway public opinion on this matter. Nonetheless, the district court held, and we agree, that the business controversy was necessarily intertwined with the religious controversy and that therefore appellants are also properly treated as limited purpose public figures with respect to the statements concerning their business activities contained in the article. The *Times* article examined the priests' business activities as part of a broader examination of the priests' religious status. As the district court stated, "the focus of the article is on the [appellants] as priests.... [T]he thrust of the story was that a group of priests, with a somewhat unusual history, had encountered challenges by the government." 665 F.Supp. at 267. Thus, the priests' public figure status with respect to the religious controversy encompasses their business activities.

Moreover, appellants have not been shy in seeking public attention through their business activities. Between 1976 and 1980, Contemporary Mission sent out over 12 million solicitations for its various mail-order products. The products themselves—such as, "The 'Living' Cross," "The Edgar Cayce Handbook for Health Through Drugless Therapy," "Young & Firm Reducing Bath," and the "Guaranteed Tax Plan 1977"—by their very nature were certain to attract a degree of public attention. Appellants' business activities also brought Contemporary Mission under the scrutiny of several state and federal governmental agencies, which received hundreds of complaints about Contemporary Mission, and, as indicated above, Contemporary Mission has been involved in numerous lawsuits concerning its mail-order business. When the Postal Service took steps to revoke Contemporary Mission's non-profit mailing permit in 1979, Contemporary Mission sought $1 million from the Postal Service for alleged violations of its constitutional rights. This court affirmed the grant of summary judgment dismissing the action, stating that Contemporary Mission's claims were "specious" and intended to "intimidate postal officials." *Contemporary Mission, Inc. v. United States Postal Service*, 648 F.2d at 106–07. These activities in themselves may warrant treating appellants as limited purpose public figures with respect to the business controversy. See *National Foundation for Cancer Research, Inc. v. Council of Better Business Bureaus, Inc.*, 705 F.2d 98, 101 (4th Cir.), cert. denied, 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983); *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 273–74 (3d Cir.1980).

■ Appellants also argue that the district court failed to make specific findings with respect to the public figure status of each of the individual priests and that it was improper for the court merely to equate the priests with Contemporary Mission. While more specific findings with respect to each individual appellant may have been desirable, we see no reversible error in the district court's holding. There is sufficient undisputed evidence in the record to establish that each of the priests participated in efforts to gain media attention for Contemporary Mission and the member priests in the early 1970's and that each bore responsibility for the business

activities of Contemporary Mission. The priests are the sole officers and directors of Contemporary Mission and have been members of Contemporary Mission since its incorporation in 1968.

### B. *Insufficient Evidence of Actual Malice*

In order to succeed on their claims, appellants, as limited purpose public figures, must establish by clear and convincing evidence that the Times published the article with actual malice, "that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 280, 84 S.Ct. at 726. "[T]here is a significant difference between proof of actual malice and mere proof of falsity." *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 511, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984). Liability requires clear and convincing evidence of a *knowing* falsehood or "subjective awareness of probable falsity." *Gertz*, 418 U.S. at 335 n. 6, 94 S.Ct. at 3004 n. 6. As we observed in *Herbert v. Lando*, 781 F.2d 298 (2d Cir.), cert. denied, 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986):

> [A] finding of actual malice cannot be predicated merely on a charge that a reasonable publisher would have further investigated before publishing.... Rather, a public figure defamation plaintiff must show either that the publisher actually entertained serious doubts about the veracity of the publication, or that there are *"obvious* reasons to doubt the veracity of the informant or the accuracy of his reports."

781 F.2d at 308 (emphasis in original), quoting *St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968). Appellants also have the burden of proving falsity, *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775, 106 S.Ct. 1558, 1563, 89 L.Ed.2d 783 (1986) ("a public-figure plaintiff must show the falsity of the statements at issue in order to prevail in a suit for defamation"), although, as a practical matter, evidence sufficient to establish actual malice will generally encompass evidence of falsity. Id. at 778, 106

S.Ct. at 1564. Thus, appellants have a "heavy burden of proof," *Lando*, 781 F.2d at 308, a burden that is designed "to assure to the freedoms of speech and press that 'breathing space' essential to their fruitful exercise." *Gertz*, 418 U.S. at 342, 94 S.Ct. at 3008, citing *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963).

Judge Broderick concluded that summary judgment was appropriate in this case because appellants had failed to come forward with sufficient facts to support a showing of actual malice by clear and convincing evidence. We agree. Summary judgment is appropriate in a defamation action, as in other actions, where there are no unresolved factual disputes as to issues material to the outcome of the litigation. See generally *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11 (2d Cir.1986), cert. denied, —— U.S. ——, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). Moreover, where the factual dispute concerns whether a publisher acted with actual malice, "the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The Court in *Liberty Lobby* reasoned that "in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden," id. at 254, 106 S.Ct. at 2513, namely, the "clear and convincing evidence" standard. The Court discounted the argument also made here that "the defendant should seldom if ever be granted summary judgment where his state of mind is at issue and the jury might disbelieve him or his witnesses as to this issue," stressing that a plaintiff opposing a fully supported motion must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Id.* at 256, 106 S.Ct. at 2514. It is not enough for the plaintiff merely to assert "that the jury might, and legally could, disbelieve the defendant's de-

nial ... of legal malice." Id. Cf. *Markowitz v. Republic National Bank of New York*, 651 F.2d 825, 828 (2d Cir.1981) ("Some facts must be asserted to support the claim that the state of mind existed.")

■ Appellants argue that they have not been provided a full opportunity to discover all the information that is essential to their opposition to the Times' motion for summary judgment. Fed.R.Civ.P. 56(f). However, appellants conducted extensive discovery below. The Times produced a huge volume of documents, including Ms. Henry's research file and her notes from certain conversations related to the article. Appellants conducted depositions of Ms. Henry for eight days and of several *Times* editors. Appellants argue that they were denied an opportunity to depose Ms. Henry's husband, who at the time of the article was the deputy metropolitan editor at the *Times*. The district court denied appellants' request for additional discovery pursuant to Rule 56(f), based in part upon its determination that Ms. Henry's husband had nothing to do with the editing of the article. Appellants were given reasonable access to Ms. Henry and other *Times* employees, and the district court was well within its discretion in denying appellants' request for additional discovery under Rule 56(f).

On appeal, this court "has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp.*, 466 U.S. at 499, 104 S.Ct. at 1958, quoting *New York Times*, 376 U.S. at 285, 84 S.Ct. at 729. Our independent review of the record reveals no indication of clear and convincing evidence that the Times acted with actual malice.

### 1. Overall Impact of the Article

■ The district court noted that while appellants do not explicitly plead a separate cause of action based upon the overall impact of the article, such a theory pervades their arguments. We agree with Judge Broderick that to the extent that appellants do raise arguments based upon the article's overall impact, such arguments are encompassed by their challenge to the individual statements, which cover a substantial portion of the article. Cf. *Lando*, 781 F.2d at 307–08 (holding that the defamatory implications of the specific statements at issue and the overall impact of the publications at issue were identical). Moreover, as Judge Broderick observed, the article does present appellants' position with respect to the various controversies, 665 F.Supp. at 271, and thus cannot be said to be completely one-sided. The article indicates that appellants (1) disclaim knowledge of the forged documents; (2) claim to have conducted thousands of masses, weddings, funerals and other services over the past several years; and (3) contend that they run an honest business, are not rich and have used their profits to finance their work. Compare *Cianci v. New Times Publishing Co.*, 639 F.2d 54, 69 (2d Cir.1980) (constitutional privilege of neutral reportage unavailable where article failed to report, among other things, appellant's claim of innocence to rape charge).

The *Times'* investigation "taken as a whole ... was sufficiently thorough and professional when held up to the daunting standards of actual malice." *Tavoulareas v. Piro*, 817 F.2d 762, 797 (D.C.Cir.) (in banc), cert. denied, —— U.S. ——, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987). The record indicates that (1) Ms. Henry researched the article over a two-month period, interviewing more than 70 persons, including three of the appellants and their counsel, and reviewed voluminous court records and clippings about appellants; (2) the article was edited by the *Times'* Regional and Deputy Regional Editors, who together had over 30 years experience as journalists; and (3) the article was reviewed by the *Times'* Religion Editor and by an attorney in the *Times'* legal department due to Contemporary Mission's litigiousness.

Appellants assert that Ms. Henry and the Times intentionally distorted and manipulated the truth in order to blacken appellants' reputations. Such bare assertions of ill will are not sufficient to establish a

triable issue of actual malice. See *Old Dominion Branch No. 496, National Association of Letter Carriers, AFL–CIO v. Austin,* 418 U.S. 264, 281–82, 94 S.Ct. 2770, 2779–80, 41 L.Ed.2d 745 (1974); *Tavoulareas,* 817 F.2d at 795. Appellants must come forward with sufficient facts to enable a jury to find by clear and convincing evidence that the Times, or Ms. Henry in particular, acted with malice in the constitutional sense, i.e., with knowledge that the statements made were false or with reckless disregard of the truth. The following review of appellants' allegations with respect to each of the challenged statements indicates that appellants have failed to meet this burden.

### 2. Statements Dealing with the Business Controversy

Appellants allege that Ms. Henry was "obsessed" with the idea that Contemporary Mission was not running an "honest business" and that therefore she ignored contrary evidence and knowingly misstated facts concerning the business controversy. While, as Judge Broderick observed, Ms. Henry may have been sloppy in places in her writing, there is nothing to suggest that she entertained serious doubts about the truth of the challenged statements.

█ In Part I of this opinion at 615–16, we have listed each of the statements that were the basis of appellants' complaint, and the reader is referred to them for convenience. Appellants challenge statement 3, claiming that it misstates the terms of the cease and desist order, which in fact provided that "Respondent shall ... (b) Cease and desist the practice of accepting mail orders and payments for its merchandise and then failing to deliver either the ordered merchandise or refunds *within a reasonable period of time.*" (emphasis added). Ms. Henry did not repeat the phrase "within a reasonable period of time." In the papers before the district court, Ms. Henry swore that she had spoken with the Connecticut Department of Consumer Protection (the CDCP), which had indicated that the State of Connecticut had taken action against Contemporary Mission, in part, because of its failure to deliver merchandise. She also notes that a press release issued by the CDCP describing the administrative complaint against Contemporary Mission, which contained language substantially similar to that contained in the cease and desist order, did not include the phrase "within a reasonable period of time." At most, Ms. Henry may have been careless in failing to accurately report the terms of the cease and desist order. However, there is nothing in the record to suggest that she recklessly disregarded the true content of the order. The statement "represents the sort of inaccuracy that is commonplace in the forum of robust debate to which the *New York Times* rule applies." *Bose Corp.,* 466 U.S. at 513, 104 S.Ct. at 1966. Cf. *Edwards v. National Audubon Society, Inc.,* 556 F.2d 113, 120 (2d Cir.), cert. denied, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977) (in invoking the privilege for neutral reportage, "[l]iteral accuracy is not a prerequisite").

Appellants also argue that statement 3 is libelous in that the cease and desist order was not "got ... against them," but rather resulted from a negotiated consent agreement and involved only Contemporary Mission and not the individual priests. They challenge statement 6, claiming that the Postal Service allegation was not made against the individual priests but rather against Contemporary Mission, and statement 7, claiming that the United States Attorney's office never considered prosecuting charges of mail fraud against the individual priests, although they apparently do not dispute that such charges were considered against Contemporary Mission. These discrepancies are so slight as to belie any suggestion of actual malice. A CDCP administrative complaint was brought against Contemporary Mission, even if the later cease and desist order was entered on consent. And, while Contemporary Mission is distinguishable from the individual priests, as Judge Broderick determined, "it is ... undeniably true that the individual [priests] controlled Contemporary Mission, Inc., determined its policies and were responsible for its actions, and that Contem-

porary Mission acted only through them." 665 F.Supp. at 259.

■ With respect to statement 10, appellants argue that the priests' religious status was not being challenged by three federal agencies. They do not dispute that Contemporary Mission's mail-order business had been scrutinized by various governmental agencies and that the Internal Revenue Service had revoked its tax-exempt status. Moreover, in this context, Contemporary Mission's business status and religious status were intertwined. Again, while it was Contemporary Mission's status and not the priests' status that was being challenged, the First Amendment does not require such precision. There is no indication that Ms. Henry was reckless in her reporting of the various governmental challenges to the mail-order business; for the most part, her discussion of the business controversy appears to have been accurate and complete.

Appellants challenge statement 11, arguing that the statement conveys the false impression that they set up a religious organization in 1968 in order to cloak a profitable mail-order business which they began some eight years later. The Times, however, argues that no such "illogical understanding" was intended or conveyed, and we agree.

### 3. Statements Dealing with the Religious Controversy

■ Appellants challenge statement 1, claiming that "[c]hurch officials in St. Louis, led by John Cardinal Carberry," never accused the priests of forging documents for their ordinations. They state that they specifically informed Ms. Henry prior to publication of the article that no such accusation had been made and that a September 12, 1980 article in the *National Catholic Reporter* that reported the alleged accusations was false. Their point apparently was that the Archdiocese did not say who it believed forged the documents. Mere denials prior to publication, however, are insufficient to establish actual malice. As we stated in *Edwards*, 556 F.2d at 121:

liability under the "clear and convincing proof" standard of *New York Times v. Sullivan* cannot be predicated on mere denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.

Moreover, the record indicates that Ms. Henry was fully justified in her belief that the accusations had indeed been made. Ms. Henry indicates that she reviewed several articles—including the *National Catholic Reporter* article and two *Times* articles from 1971—which discussed the accusations, as well as a written statement by Father Berkery acknowledging the accusations. A July 16, 1971 article in the *St. Louis Review*, an Archdiocesan newspaper, explicitly sets forth accusations by the purported authors of the documents that the documents were forged. In public statements made in the early 1970's, the priests themselves stated that they had been accused of forging documents and criticized Cardinal Carberry for causing such accusations to be printed in the *St. Louis Review*. See, e.g., the priests' open letter to Cardinal Carberry, dated August 3, 1971, quoted above.

Appellants allege that Ms. Henry was "obsessed" with the question of whether they were "real priests." They claim that the article mischaracterizes their canonical status and fails to convey the fact that they are fully ordained priests. Specifically, they challenge statement 4, the subhead "Ordinations Called Forged;" statement 5, stating that the priests "have been in a kind of canonical limbo;" and statement 10, stating that the priests' religious status is "being challenged" by officials of their own church.

■ While the subhead "Ordinations Called Forged" was apparently added by a copy editor just prior to publication, this in itself does not mean that the statement cannot be actionable. The *Times* is responsible for the content of its articles, whether the text is written by a reporter or added by a copy editor at a later stage. How-

ever, we do not think that, in context, the statement was defamatory. We agree that the subhead somewhat mischaracterizes the controversy surrounding the ordinations, since it was the documents supporting the ordinations and not the ordinations themselves that were called forged. But, the statement is immediately followed by text that clarifies that the priests were indeed ordained and that the allegations of forgery related to the documents submitted in support of the ordinations and not the ordinations themselves.

Similarly, in statement 5, the statement that the priests "have been in a kind of canonical limbo" cannot by itself support a finding of actual malice. As discussed above, Ms. Henry was justified in her belief that church officials had accused the priests of involvement with the forgery controversy surrounding the ordinations. The phrase "canonical limbo" is used in a colloquial way, and taken in this light, does not seem unfounded. Nowhere does the article state that the appellants are not ordained priests or suggest that efforts to defrock the priests have ever been initiated.

To the extent church officials raised questions concerning the forged documents, it could be said that in some sense church officials challenged the priests' religious status. A church newspaper said as much. The July 16, 1971 article in the *St. Louis Review* states that "[a] spokesman for the Archdiocese of St. Louis said that other letters in the documentation [concerning the ordinations] 'raised more doubts about the status of the members of the Contemporary Mission under church law.' " Moreover, the assertion in statement 10 that church officials challenged the priests' religious status is essentially the same as other statements in the article such as statement 12, which we discuss below.

 Appellants also challenge statements attributed to various church officials related to their religious status. They challenge statement 2, claiming that Monsignor Cusack did not deny writing a letter to the Postal Service stating that the priests' "ordination and current canonical efforts have

the full recognition of the church." Ms. Henry submitted contemporaneous notes to the district court purportedly reflecting a telephone conversation she had with Monsignor Cusack, in which he allegedly denied having written the letter. In response, appellants submitted a transcript of a November 13, 1980 telephone conversation between Father Berkery and Monsignor Cusack (apparently taped without the Monsignor's knowledge or permission) in which the Monsignor purportedly stated that he told Ms. Henry in their telephone conversation that he would not verify any letter "except that if I saw it." Appellants state that Monsignor Cusack declined to furnish an affidavit upon the advice of Diocesan counsel. Even if we make the assumption, however, that the transcript of the telephone conversation submitted by appellants is accurate and the further questionable assumption that such evidence is properly considered on the motion for summary judgment, see *Beyah v. Coughlin*, 789 F.2d 986, 989 (2d Cir.1986), quoting 6 Moore's Federal Practice ¶ 56.22[1], at 56–1312 to 56–1316 (2d ed. 1985), ("[h]earsay testimony ... that would not be admissible if testified to at the trial may not properly be set forth in [the Rule 56(e) ] affidavit"), we do not believe it is sufficient to establish clear and convincing evidence of actual malice.

There is little in the record, beyond appellants' bare accusations, to suggest that Ms. Henry's investigation was pursued in bad faith. As noted above, the investigation on the whole appears to have been thorough and professional. There is no evidence that suggests that Ms. Henry knowingly or recklessly mischaracterized the Monsignor's statements in her contemporaneous notes of her telephone conversation with him. Accordingly, the statement in the article cannot be said to have been published with actual malice.

Appellants further challenge statement 2, claiming that the Bridgeport Diocese did not have jurisdiction over them. Apparently, Contemporary Mission's status was that of a religious society, and it was not associated with a specific diocese. Nonetheless,

the Bridgeport Diocese did handle inquiries concerning Contemporary Mission, which was in the Diocese's geographic region. Appellants themselves apparently asked Monsignor Cusack to write to the Postal Service on their behalf.

 Appellants challenge statement 5, claiming that church officials did not call them clerical dilettantes and that Cardinal Carberry did not refuse to ordain them, arguing that they never asked Cardinal Carberry to ordain them. Ms. Henry states that the phrase "clerical dilettantes" was based on a 1971 *Times* article (although the phrase was not explicitly attributed to church officials in the article) and that the statement "Cardinal Carberry refused to ordain them" was based on at least two other articles in her research file. Reliance on previously published articles is not always sufficient in itself to negate any possible finding of actual malice. Actual malice can be established if the reporter had "obvious reasons to doubt the veracity" of the articles. *St. Amant*, 390 U.S. at 732, 88 S.Ct. at 1326. Here, however, the statements in the articles upon which Ms. Henry relied are consistent with the other facts she uncovered and no specific evidence has been offered by appellants to establish that the reporter "entertained serious doubts" about their truth. *Lando*, 781 F.2d at 308.

Similarly, appellants' challenge to statement 12 must fail. Ms. Henry's research appears to provide ample support for the statement that "other priests" contradict "[t]he priests [who] say that the mission is a pious society and that its members perform all traditional priestly functions and good works." Ms. Henry apparently based this statement upon interviews with appellants, church officials and her review of documentary evidence and other newspaper articles. There is nothing in the record that suggests by clear and convincing evidence that she entertained serious doubts about the truth of the statement.

Appellants challenge statement 14 on the ground that Father O'Reilly and Father Berkery purportedly told Ms. Henry that they had "registered" baptisms in the records at St. Catherine's Church in Greenwich, Connecticut, not that they had "conducted" many services at the church. They stress that Ms. Henry concedes having lost her notes to the conversation in which Father O'Reilly and Father Berkery discussed their relationship with St. Catherine's. They apparently do not dispute, however, that Father O'Reilly and Father Berkery referred to Father O'Connor, the pastor of St. Catherine's church, to support their claims. Nor do they offer any evidence to dispute Ms. Henry's assertion that she did in fact speak with Father O'Connor, who denied having any connection with the priests. Even if Ms. Henry did misquote Father O'Reilly and Father Berkery concerning their relationship with St. Catherine's, there is insufficient evidence to suggest that the statement was published with actual malice.

 Appellants challenge several statements dealing with Father O'Reilly's religious status in particular. They challenge statement 8, claiming that Father O'Reilly did not attempt to divorce his wife, but rather that she divorced him. They challenge statement 9, claiming that there is no longer such a concept as "excommunication" within the Roman Catholic church and that since Father O'Reilly had switched to the Eastern Rite of the Catholic Church prior to his marriage, the question of excommunication would not have arisen. They challenge statement 10, claiming that the statement incorrectly states that the priests are all Roman Catholic priests, when in fact Father O'Reilly is an Eastern Rite Catholic priest. It is true that statements impugning the reputation of a clergyman should not be treated lightly. Here, however, the statements are substantially true. The article did not suggest that Father O'Reilly was excommunicated, but rather presented his own explanation that having switched to the Eastern Rite he was permitted to marry. Father O'Reilly concedes that he was once married and is now divorced and that he was once a Roman Catholic priest but is now an Eastern Rite Catholic priest. Whether or not Ms. Henry was technically correct in her description of

canon law, she believed the statements were supported by her research and there is no indication that she had reason to doubt their veracity.

█ Finally, appellants challenge statement 13, claiming that the statement is defamatory because the priests did not merely "dream" of using profits from their musical talents to support their labors for the poor, but in fact did use the profits for such purposes. Appellants do not claim that the statement is false; they merely argue that a more laudatory statement should have been used in its place. The argument comes close to being frivolous and merits little discussion. The statement was not defamatory.

In sum, the alleged innuendo in this and other statements in the article which appellants challenge cannot support a finding of actual malice. The mere fact that the *Times* article may have been somewhat aggressive and expressed a point of view in its presentation of the facts is not sufficient to establish clear and convincing evidence of actual malice.

### III. Conclusion

We have determined that appellants are limited purpose public figures for the purpose of the statements in the article concerning the religious and business controversies, and that they have failed to come forward with sufficient facts to support a showing of actual malice by clear and convincing evidence. The judgment of the district court is therefore affirmed.

