CORPORATE TRAINING UNLIMITED, INC., Donald M. Feeney, Jr., and Judy G. Feeney, Plaintiffs,

v.

NATIONAL BROADCASTING COMPANY, INC., Defendant.

No. 93–CV–4756 (RJD).

United States District Court, E.D. New York.

Oct. 17, 1997.

Robert K. Erlanger, New York, NY, for Plaintiffs.

Karen A. Estilo, Gayle Chatilo Sproul, New York, NY, for Defendant National Broadcasting Company, Inc.

## MEMORANDUM AND ORDER

DEARIE, District Judge.

This is a defamation action by Corporate Training Unlimited, Inc. ("CTU") and its principals, Donald and Judy Feeney, against the National Broadcasting Company, Inc. ("NBC"). The action arises from the manner in which plaintiffs were portrayed, and from certain statements made about them, in a March 23, 1993 *Dateline NBC* broadcast segment entitled "Rambo Goes to Reykjavik" (the "Broadcast"). An additional claim, for tortious interference with prospective contractual relations, has been withdrawn by stipulation. On December 1, 1994, this Court denied NBC's motion to dismiss. *Corporate Training Unlimited, Inc. v. National Broadcasting Co., Inc.*, 868 F.Supp. 501 (E.D.N.Y. 1994). NBC now moves for summary judgment. For the reasons stated below, that motion is granted.

### Background

CTU is a privately-held security corporation which specializes, among other things, in attempting to rescue American children who have been abducted overseas by non-custodial parents. CTU claims it has successfully returned American children to the United States from Tunisia, Jordan, Bangladesh, Sweden, Peru, and Ecuador. *Dateline NBC* is a weekly television magazine program broadcast by NBC.

In 1992, CTU was retained on behalf of two American citizens, Fred Pittman and Brian Grayson, seeking to locate and repatriate their respective daughters. The girls' Icelandic mother, Erna Eyjolfsdottir (Erna Pittman Grayson) had taken them to Iceland in violation of Florida court orders. CTU's mission ended unsuccessfully, with the two daughters remaining in Iceland and Donald Feeney, CTU's President, and Brian Grayson being arrested, tried and convicted of kidnapping in an Icelandic court.

This mission was the subject of the Broadcast, which runs approximately fifteen minutes and is entitled "Rambo Goes to Reykjavik." The Broadcast consists primarily of a series of excerpts from interviews of the participants, interspersed with voiceover commentary supplied by NBC reporter Brian Ross. Those interviewed include: Erna Eyjolfsdottir, the Icelandic mother of Elizabeth Pittman and Anna Grayson; Brian Grayson, Anna's father and the one-time husband of Erna Eyjolfsdottir; plaintiff Donald Feeney; Olbia Grayson, Brian Grayson's mother; Ginger Grayson, Brian's then-current wife; Elizabeth Pittman, the daughter of Erna Eyjolfsdottir and Fred Pittman; and plaintiff Judy Feeney.

The Broadcast begins with images of Erna Eyjolfsdottir and Brian Grayson as they separately describe their marriage, breakup and the custody battle over their five-year-old daughter Anna and eleven-year-old Elizabeth, the daughter of Eyjolfsdottir and her first husband, Fred Pittman. Ross then introduces plaintiffs as "a group of self-styled American commandos who have gained great fame, going around the world with their own kind of solution for complicated international custody cases like the one involving Etna[1] and Brian." According to the Broadcast, "the Feeneys have come to be known as

1. Throughout the Broadcast, Ross refers to Erna Eyjolfsdottir as "Etna."

American heroes," the subjects of a book and a television movie about one of their successful child "rescue" missions. The video segment during this introduction includes the image of a car swerving at high speed, screeching and spinning to a halt, while individuals, many clad in military fatigues, are shown training in military-style maneuvers. In a later shot, an off-camera voice yells "Fire," while the viewer sees a close-up of the hands of various individuals firing weapons at a target during what is presumably a combat training session. The narrator then describes plaintiffs: "Operating out of Fayetteville, North Carolina, Donald and Judy Feeney run a company that trains corporate security guards. The company has been in bankruptcy since 1991—the Feeneys say because they lose money helping American parents."

According to the narrator: "Feeney is a former decorated Delta Force commando, who was part of the failed mission to rescue American hostages in Iran.... Feeney was forced to leave the military in 1986 for less-than-satisfactory-service—what Feeney calls some 'minor financial improprieties.'" (Tr. at 10.)

The Broadcast continues with a description of the elaborate CTU plot to retrieve Anna and Elizabeth from Iceland. CTU operatives went to Iceland to convince Eyjolfsdottir that they were doing advance work for a Sylvester Stallone movie, and that her home might be used as a location for filming. The story that a movie starring Sylvester Stallone would be filmed in Iceland later received significant newspaper coverage in that country, and the Broadcast suggests this coverage subjected plaintiffs' subsequent activities to public scrutiny in Iceland.

As part of the mission, CTU flew Eyjolfsdottir to Switzerland to meet Donald Feeney, who was posing as the film's director. Because Eyjolfsdottir brought only one of the girls with her on that trip, plaintiffs did not attempt to "rescue" the daughters at that time. Shortly after Eyjolfsdottir returned to Iceland, CTU put her up in a Reykjavik hotel. After an evening of drinking, plaintiffs attempted to recapture Anna and Elizabeth while Erna was sleeping. After Erna awoke and reported her daughters missing, Judy Feeney, who had taken Elizabeth out of the country, was stopped by authorities in Luxembourg. Don Feeney and Brian Grayson, who had traveled to Iceland to assist in the operation, were stopped by Icelandic authorities before they could transport Anna out of the country. Both girls were returned to their mother, and Donald Feeney and Brian Grayson were later convicted of kidnapping and sentenced to prison.

According to the Broadcast, the "American commandos bungled mission." Reporter Ross adds: "We talked with the Graysons last week, just before the Supreme Court of Iceland held up [sic] Brian's conviction and ordered him to prison for two more months. The Graysons say they now regret ever getting involved with the commandos, and they are beginning to wonder if the Feeneys told them the truth, especially about what happened to all the money the Graysons gave them." Olbia Grayson, Brian's mother, had paid plaintiffs approximately $40,000.

During the Broadcast, Ross and the Graysons discuss some of the Feeneys' requests for money, including requests for additional funds to hire a private jet big enough to transport Grayson and his child, along with a crew from CBS' *60 Minutes*. (Tr. at 13.) Ross reports that no private jet was ever hired. (Tr. at 14.) The Broadcast continues with Ross stating: "Now back in the United States, Feeney's wife, Judy, in one final twist, claims there was no kidnapping, no law broken, because Etna was in on the scheme, and had been paid [$5,000] to let the children go." (Tr. at 14.) Erna Eyjolfsdottir is then quoted denying the accusation. Ross adds in a voiceover: "Authorities in Iceland agree. And for Etna, the story about $5,000 to sell Anna and Elizabeth is the final outrage, the final lie, from a group of Americans who some call heroes." There is footage of the children coloring, then a close-up of Eyjolfsdottir: "What they did to me and my children, I do not see any heroes. I see people that lie and destroy lives. I don't see any heroes at all." (Tr. at 14.)

In the last minute or so of the Broadcast, NBC provides a summary. The exchange

between Ross and Stone Phillips begins as follows:

> ROSS: Tonight, both Don Feeney and Brian Grayson are in prison in Iceland: Grayson for two months; Feeney, the commando, for two years. Feeney and his wife, Judy, say this is the first time one of their missions has failed. And over the last few days, we've heard from the families of five children who the Feeneys have brought back to this country, families which have nothing but praise for the way the Feeneys operate. Stone:
>
> PHILLIPS: But the tactics, I would have to say, are unlike any commando tactics I've ever seen, Brian.
>
> ROSS: Well, that's what the Graysons are saying now. They wonder about these champagne tactics, all the limousines and the hotels and the first-class lifestyle.

(Tr. at 14–15.) After further discussion, the Broadcast ends with the words of Brian Ross: "There are some 4500 American children in similar cases, but the State Department says going the route of the commandos is folly; that in fact, you're better off spending the money on lawyers in the country where the child might be." (Tr. at 15.)

*The Complaint*

The complaint alleges, in pertinent part, that:

> Through statements, portrayals, depictions, and implications, the Broadcast defamed CTU, Don Feeney, and Judy Feeney in the following ways, among others:
>
> (a) Falsely and continuously referring to and characterizing CTU operatives and the Feeneys as "Rambo"s.
>
> (b) Falsely and continuously referring to, characterizing, portraying, and depicting CTU operatives and the Feeneys as violent.
>
> (c) Falsely portraying and depicting CTU and the Feeneys to be violent in the context of a child custody case.
>
> (d) Falsely stating that the Feeneys and CTU supply "simple," violent solutions to "complex" custody cases.
>
> (e) Falsely stating that CTU had been in bankruptcy since 1991.
>
> (f) Falsely stating that Don Feeney had been forced to leave the Army.
>
> (g) Falsely implying that Don Feeney had been dishonorably discharged from the Army.
>
> (h) Falsely using Don Feeney's own words to state that he had admitted committing financial improprieties in the military.
>
> (i) Falsely implying that Don Feeney and Judy Feeney are financially dishonest.
>
> (j) Falsely implying that CTU and the Feeneys prey on desperate parents.
>
> (k) Falsely implying that CTU and the Feeneys are incompetent.
>
> (*l*) Falsely stating that the Feeneys and CTU lied on numerous occasions.
>
> (m) Repeating and publishing Eyjolfsdottir's defamatory and false statements.
>
> (n) Falsely implying that a CTU operative had given Eyjolfsdottir sleeping pills.
>
> (o) Falsely implying that CTU and the Feeneys either stole or dishonestly used the Grayson's [sic] money.
>
> (p) Falsely implying that CTU and the Feeneys had lied about the reason for requiring an extra $10,000.
>
> (q) Falsely implying that CTU and the Feeneys had concocted a story about the "60 Minutes" camera crew wanting to accompany them on the mission.
>
> (r) Repeating and publishing the Graysons' defamatory and false statements.
>
> (s) Falsely stating that the Graysons regretted getting involved with the Feeneys.
>
> (t) Falsely stating that the CTU rescue operation fell apart when Brian Grayson had arrived in Iceland because of the "movie scam."
>
> (u) Falsely stating that "all the spending quickly backfired" when a local newspaper broke the story about "Rambo."

(Compl. at ¶ 67(a)–67(u).)

### Discussion

1. *Applicable Law*

Summary judgment is appropriate if, " 'after drawing all reasonable inferences in favor

of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party.'" *United States v. All Right, Title & Interest in Real Property,* 901 F.2d 288, 290 (2d Cir.1990) (quoting *Murray v. National Broadcasting Co. Inc.,* 844 F.2d 988, 992 (2d Cir.), *cert. denied,* 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988)). The party against whom summary judgment is sought must set forth specific facts showing there is a genuine issue of material fact for trial. FED. R. CIV. PRO. 56(c), (e).

■■ Defamation claims provide redress for injuries to a party's reputation caused by statements that "tend to expose [him] to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number in the community." *Levin v. McPhee,* 119 F.3d 189, 195 (2d Cir. 1997) (quoting *Tracy v. Newsday, Inc.,* 5 N.Y.2d 134, 135, 155 N.E.2d 853, 854, 182 N.Y.S.2d 1, 3 (1959)). It is for the court to decide whether a statement, in the context of the overall publication or broadcast, is reasonably susceptible to defamatory meaning. *Id.* If the statement is subject to defamatory meaning, it is then for the jury to determine whether a plaintiff has been defamed. *Id.*

■ The First Amendment requires that a public figure alleging defamation regarding matters of public concern show "actual malice" on the defendant's part. "Actual malice" means knowledge that defamatory statements regarding the plaintiffs were untrue, or reckless disregard as to the truth or falsity of the statements. *New York Times v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964) (creating "actual malice" standard for public officials); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 162–63, 87 S.Ct. 1975, 1995–96, 18 L.Ed.2d 1094 (Warren, C.J., concurring) ("actual malice" standard extended to "public figures"), *reh'g denied,* 389 U.S. 889, 88 S.Ct. 11, 13, 19 L.Ed.2d 197, 198 (1967); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 352, 94 S.Ct. 2997,

3013, 41 L.Ed.2d 789 (1974) (non-public figures may be deemed public figures with respect to a particular issue or controversy); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) ("actual malice" standard applies only if contested statement regards matter of public concern). The public figure doctrine is based upon "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Contemporary Mission, Inc. v. New York Times Co.,* 842 F.2d 612, 619 (2d Cir.) (quoting *New York Times v. Sullivan,* 376 U.S. at 270, 84 S.Ct. at 720–21), *cert. denied,* 488 U.S. 856, 109 S.Ct. 145, 102 L.Ed.2d 117 (1988). Also, as a policy matter, public figures have a greater burden in defamation cases because they have voluntarily exposed themselves to public scrutiny and presumably have greater access to the media to counteract the damaging effects of any defamatory statements. *Gertz,* 418 U.S. at 344, 94 S.Ct. at 3009.

Plaintiffs concede that, for purposes of this litigation, they are limited purpose public figures as to the topic of international child abduction. Plaintiffs' Memorandum of Law at 20. Thus, because the Court concludes that the Broadcast involved matters of public concern, the First Amendment requires application of the "actual malice" standard to this case. Therefore, in addition to showing, by a preponderance of the evidence, that the statements they complain of are defamatory, plaintiffs must show that they were false, *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 775, 106 S.Ct. 1558, 1563, 89 L.Ed.2d 783 (1986), and, by clear and convincing evidence, that they were made with "actual malice"—that is, with knowledge of their falsity or with reckless disregard of whether they were true or false. *See Harte-Hanks Communs., Inc. v. Connaughton,* 491 U.S. 657, 661, 109 S.Ct. 2678, 2682–83, 105 L.Ed.2d 562 (1989) (discussing varying burdens of proof for different elements); *Contemporary Mission,* 842 F.2d at 621.[2]

---

2. In cases not involving matters of public concern and therefore not implicating heightened First Amendment protections for defendants, a plaintiff need not prove "actual malice." *Dun & Bradstreet,* 472 U.S. at 751–61, 105 S.Ct. at 2941–46. Furthermore, in cases not involving public figures or matters of public concern, the inapplicability of constitutional precedents leaves undisturbed the common law rule that truth is a defense in a defamation action. *Id.*

According to the Second Circuit:

[A] finding of actual malice cannot be predicated merely on a charge that a reasonable publisher would have further investigated before publishing.... Rather, a public figure defamation plaintiff must show either that the publisher actually entertained serious doubts about the veracity of the publication, or that there are *"obvious* reasons to doubt the veracity of the informant or the accuracy of his reports."

*Id.* (emphasis in original) (quoting *Herbert v. Lando,* 781 F.2d 298, 308 (2d Cir.1986) (quoting, in turn, *St. Amant v. Thompson,* 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968)), *cert. denied,* 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986)). In the context of a summary judgment motion, the Court must determine "whether the evidence in the record could support a reasonable jury finding ... that the plaintiff has shown actual malice by clear and convincing evidence." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255–56, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Thus, the Court must view the evidence presented on this motion "through the prism of the substantive evidentiary burden," *id.* at 254, 106 S.Ct. at 2513, *i.e.,* the clear and convincing evidence standard. On the actual malice question, it is not enough for plaintiffs to argue that a factual issue exists because defendant's state of mind is at issue; rather, plaintiffs must show "concrete evidence from which a reasonable juror could return a verdict in [their] favor." *Id.* at 256, 106 S.Ct. at 2514; *Contemporary Mission,* 842 F.2d at 621–22.

■ To show a defendant's "reckless disregard" for the truth or falsity of the statements, plaintiffs must demonstrate that the defendant acted with "a 'high degree of awareness of probable falsity,' or must have 'entertained serious doubts as to the truth of [the statements].' " *Harte–Hanks,* 491 U.S. at 667, 109 S.Ct. at 2686 (quoting *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964) and *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325–26, 20 L.Ed.2d 262 (1968)). Under New York law, which governs this diversity action, an allegedly defamatory statement is not actionable if, in context, the average viewer would perceive it as a statement of opinion. *Immuno AG. v. Moor–Jankowski,* 77 N.Y.2d 235, 567 N.E.2d 1270, 566 N.Y.S.2d 906 (constitutional immunity for "statements of opinion relating to matters of public concern that do not contain a provably false factual connotation") (citing *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 19, 110 S.Ct. 2695, 2706, 111 L.Ed.2d 1 (1990)) (other citations omitted), *cert. denied,* 500 U.S. 954, 111 S.Ct. 2261, 114 L.Ed.2d 713 (1991). Thus, statements in the Broadcast that cannot "reasonably [be] interpreted as stating actual facts" about plaintiffs are protected. *Milkovich,* 497 U.S. at 19, 110 S.Ct. at 2706 (quoting *Hustler Magazine v. Falwell,* 485 U.S. 46, 50, 108 S.Ct. 876, 879, 99 L.Ed.2d 41 (1988)).

■ Resolution of the important "fact/opinion question" requires the Court to conduct a three-stage inquiry involving consideration of whether 1) the specific language has a precise and readily understood meaning; 2) the statements are susceptible of being proven false; and 3) the context signals to the viewer that what is being conveyed is likely to be opinion rather than fact. *Levin,* 119 F.3d at 196 (citing New York cases). In undertaking such an inquiry, the Court should "begin[ ] by looking at the content of the whole communication, its tone and apparent purpose" rather than examining the challenged statements in isolation. *Immuno AG.,* 77 N.Y.2d at 254, 567 N.E.2d at 1281, 566 N.Y.S.2d at 917.

*2. Allegedly Defamatory Statements*

To begin with, the Court notes that the overall tone of the Broadcast, while typically somewhat sensational, essentially tells the story of an attempted child "rescue" mission that, despite being performed by professionals who had been successful in the past, employed unorthodox and expensive methods and went awry, leaving its intended beneficiaries disappointed, upset and, in one case, jailed. The Court will examine each of plaintiffs' allegations in that context.[3]

---

3. In its earlier opinion, the Court concluded that

certain opinion-type statements in the Broadcast

### A) *Don Feeney's Military Discharge*

In the Broadcast, NBC reported that "Feeney was forced to leave the military in 1986 for less than satisfactory service—what Feeney calls some 'minor financial improprieties.'" In its earlier opinion, the Court denied NBC summary judgment on the question of whether this statement is actionable, Dec. 1, 1994 Memorandum & Order, at 23, 868 F.Supp. at 512, partly because Feeney denied having made the quoted statement. The record has now been more fully developed, and the Court is better able to analyze this statement in relation to the evidence developed.

■ As NBC correctly points out, a defamatory quotation is not necessarily actionable simply because it is not an exact reproduction (or even if it is a deliberate alteration) of the subject's statement. Rather, the alteration must "result in a material change in the meaning conveyed," and the *difference* must potentially injure the subject's reputation. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517, 524, 111 S.Ct. 2419, 2433, 2436–37, 115 L.Ed.2d 447 (1991). Thus, one question is whether Don Feeney admitted, *in substance*, committing "minor financial improprieties" while in the Army.

#### i) *Financial improprieties*

■ Brian Grayson, in his deposition, testified that Feeney admitted to him, while they were in Icelandic jail, that his discharge related to "financial improprieties." Feeney, at his deposition, conceded that this was not a mischaracterization of his statements to Grayson. Also, in Feeney's form application for military discharge, he admitted guilt regarding certain charged offenses (conspiracy to make and submit false claims; larceny over $100; and making and presenting a false claim). A book about the Feeneys' enterprise, entitled *Rescue My Child* and published with their cooperation, reports that Feeney left the Army after refusing to accept

disciplinary action when an audit disclosed "irregularities" in his expense reports in Beirut. According to the book, Feeney arranged for his hotel to overcharge the U.S. Embassy for his room and return some portion of the difference to him in cash. Plaintiffs do not contest these points. Therefore, it appears the statement about "financial improprieties" is substantially true. Under New York law, "substantial truth suffices to defeat a charge of libel." *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 301 (2d Cir.1986), *cert. denied*, 479 U.S. 1091, 107 S.Ct. 1303, 94 L.Ed.2d 158 (1987). No reasonable fact finder could conclude on the basis of the uncontested facts that plaintiff was defamed by the Broadcast's reference to "financial improprieties." Even if the statement were not substantially true, there is no evidence that could lead a reasonable jury to conclude, by clear and convincing evidence, that the statement was made with "actual malice."

#### ii) *Feeney was "forced to leave the military"*

■ While in the military, Feeney was confronted with the charges against him regarding the "financial improprieties" discussed above. Rather than face court martial, he submitted a request for discharge "for the good of the service" under Chapter 10 of the Army's Regulations. The form request contained an admission of the charges against him (or lesser included offenses) and indicated that the applicant may be subject to dishonorable discharge. Feeney's Special Forces commander, then-colonel William F. Garrison, apparently recommended that Feeney be granted an honorable discharge, and he received one. NBC claims that during its initial investigation of this story, a number of people, including Judy Feeney and a former Special Forces colleague of Don Feeney, told NBC that Feeney was discharged under Chapter 13 of the Regulations, which pro-

---

could not appropriately be dealt with at the pleadings stage because they might imply the existence of undisclosed facts, and therefore potentially be actionable. The record has since been fully developed through discovery, and

therefore allows the Court to examine better, among other things, whether a reasonable fact finder could determine that certain statements and implications made in the Broadcast were untrue and made with "actual malice."

vides for discharge for unsatisfactory performance. This misstatement, apparently precipitated in part by Judy Feeney's confusion between chapters of the United States Bankruptcy Code and the Army's Regulations, apparently is the source of NBC's Broadcast statement that Feeney was forced to leave the military "for less than satisfactory service." Plaintiffs claim Feeney made the nature of his discharge clear to NBC from the outset. While it is not precisely accurate that Feeney was "forced to leave the military," this statement, taken in context, is not substantially untrue. NBC clearly was misinformed about Feeney's discharge by a number of sources and, in response to NBC's inquiries, the Army refused to disclose information regarding the discharge. There is no evidence in the record that could support a reasonable jury finding that NBC made the statement with "actual malice" by clear and convincing evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255–56, 106 S.Ct. at 2513–14. More specifically, plaintiffs have not produced evidence that NBC "actually entertained serious doubts" as to the veracity of the statement, or that there are "obvious reasons" to doubt the informants or their veracity. *See Contemporary Mission*, 842 F.2d at 621.

iii) *Feeney's honorable discharge*

[redacted] Plaintiffs further claim that the ordinary viewer appreciates only two types of military discharge— —honorable and dishonorable. Plaintiffs claim the statement in question falsely implies Feeney was dishonorably discharged. The Seventh Circuit has held that where a plaintiff claims that statements are defamatory by innuendo, or through the implications they raise, he must show by clear and convincing evidence that the defendant intended or was subjectively aware of the implication allegedly raised. *Saenz v. Playboy Enterprises, Inc.*, 841 F.2d 1309, 1318 (7th Cir.1988); *Woods v. Evansville Press Co., Inc.*, 791 F.2d 480, 487 (7th Cir.1986); *see also Armstrong v. Simon & Schuster*, 85 N.Y.2d 373, 649 N.E.2d 825, 625 N.Y.S.2d 477, 481–82 (1995) (stating that courts have adopted higher standards for claims of defamation by implication). NBC challenges the implication of dishonorable discharge. In any event, there is no evidence that the NBC employees responsible for the Broadcast were *aware* of that implication when the Broadcast was aired. The Court concludes that, taken in context, this statement does not create a materially false impression of the nature of Feeney's discharge. Even if such an impression was left, there is insufficient evidence to support a reasonable jury finding that NBC made the statement with "actual malice" by clear and convincing evidence.

B) *CTU's Bankruptcy*

[redacted] According to the Broadcast, "the Company [CTU] has been in bankruptcy since 1991, the Feeneys say because they lose money helping American parents." CTU had in fact successfully emerged from a Chapter 11 bankruptcy proceeding some time prior to the Broadcast. Plaintiffs claim this statement, along with others, was used to portray them as dishonest. NBC points out that another Feeney-owned company was in bankruptcy at the time of the Broadcast; the Feeneys themselves had previously filed for personal bankruptcy; and CTU had recently emerged from a bankruptcy proceeding. NBC also claims that when Rhonda Schwartz, Dateline's producer, called Judy Feeney shortly before the Broadcast to confirm that CTU was still in bankruptcy, Ms. Feeney reported that it was. Ms. Feeney, at her deposition, didn't recall that statement, but said "I'm sure I said it, if she said I said it." Therefore, even though the statement was inaccurate as of the time of the Broadcast, there is no evidence it was made with the requisite knowledge or reckless disregard to be actionable. Nor is there reason to believe NBC "actually entertained serious doubts" about its veracity. *See Contemporary Mission*, 842 F.2d at 621.

C) *General Criticisms of the Broadcast's Slant*

Plaintiffs complain generally that the Broadcast was intended to portray them as dishonest, incompetent and violent. Specifically, they allege that NBC did not include,

**122**

in the Broadcast, positive statements made about them by Brian Grayson, who allegedly believed the movie plot was a "great success" and Olbia Grayson, Brian's mother, who financed the mission, and had "only positive things to say" about plaintiffs. Instead, plaintiffs claim, Olbia Grayson was portrayed as a "typical American grandmother" duped by charlatan "commandos." The Broadcast also did not include statements from Fred Pittman, who also allegedly had positive feelings about the plaintiffs.

■ With regard to this criticism that NBC failed to incorporate material favorable to plaintiffs into the Broadcast, the Second Circuit has stated, in the context of a New Jersey false light portrayal claim, that the First Amendment prohibits "a rule that holds a media defendant liable for broadcasting truthful statements and actions because it failed to include additional facts which might have cast plaintiff in a more favorable or balanced light." *Machleder v. Diaz*, 801 F.2d 46, 55 (2d Cir.1986), *cert. denied*, 479 U.S. 1088, 107 S.Ct. 1294, 94 L.Ed.2d 150 (1987). The fact that NBC may not have included certain favorable statements regarding plaintiffs, in and of itself, cannot support their defamation claim. In any event, the Broadcast includes numerous statements favorable to the Feeneys, including reports that "they have come to be known as American heroes" and have successfully repatriated numerous abducted American children. Indeed, the Broadcast winds down with statements that the Feeneys reported that no previous child "rescue" missions had failed, and that numerous satisfied former clients contacted NBC to support plaintiffs.

■ Plaintiffs also allege that the Broadcast created the false impression that Ginger Grayson, Brian's then-current wife, was one of CTU's clients so as to legitimize her criticisms of plaintiffs. According to the Broadcast, Ginger Grayson was "[keeping] track of the mounting bills" and finding it "hard to understand what the commandos were thinking." Ginger was not technically plaintiffs' client (in that her mother-in-law was paying CTU's fees), and therefore not personally responsible for the "mounting bills." Plaintiffs allege she was unaware of the details of the operation until shortly before her husband attempted to leave Iceland with his daughter.

However, when NBC representatives began interviewing her in preparation for the Broadcast, Ginger Grayson had possession of a large number of receipts purportedly representing plaintiffs' claimed expenses for the mission. She testified that they represented significantly less than the $40,000 paid by her mother-in-law, and expressed doubts about some of the explanations plaintiffs had given for the need for additional funds. Regarding his Icelandic legal expenses, Brian Grayson testified: "these numbers are going to stick in Ginger's head a lot better than mine. She was keeping track of all this ... and she's very much the accountant oriented person." The Broadcast also makes it clear that Olbia Grayson paid plaintiffs' fees ("[o]ver the next three months, [Olbia] Grayson would send the Feeneys some $40,000.").

There is insufficient evidence for a reasonable jury to find that NBC's statements that Ginger was "[keeping] track of the mounting bills" and having difficulty understanding "what the commandos were doing" were not substantially true. And there is no evidence that NBC made the statements with "actual malice."

■ Plaintiffs further allege that the use of background footage of their training center, including images of "commando"-type military training, created the false impression plaintiffs used violence in their "child rescue missions" and to prey on desperate clients. Again, although NBC certainly emphasized the image of plaintiffs as "commandos," the Broadcast made clear that CTU was involved in numerous other operations, including the training of corporate security guards by former military members like Mr. Feeney. Plaintiffs have repeatedly referred to themselves as "commandos," and there is nothing in the Broadcast to indicate that they used physical violence in their attempts to "rescue" Anna Grayson and Elizabeth Pittman or other children.

### D) *The Title "Rambo Goes to Reykjavik"*

■ Plaintiffs claim that NBC's title for the Dateline segment in question, "Rambo

Goes to Reykjavik" is not a fair representation of its subject matter and therefore actionable under New York law. *See Schermerhorn v. Rosenberg*, 73 A.D.2d 276, 286–87, 426 N.Y.S.2d 274, 283 (2d Dep't 1980). Plaintiffs argue that the title falsely compares them to the "fictional psychopath" who "uses deadly force as a means to accomplish his ends." Although the complaint alleges that plaintiffs were defamed by the Broadcast's references to them as "Rambos," it does not raise the instant claim—that the Broadcast's title misrepresents its content. This allegation was therefore inappropriately raised in plaintiffs' response to NBC's motion for summary judgment. In any event, in the context of the Broadcast, the title reasonably can be understood to relate to the scam movie deal plaintiffs used to lure Erna Eyjolfsdottir into their confidence, and not to plaintiffs themselves. Reports of the fictitious movie, which was to star Sylvester Stallone, were picked up by Icelandic newspapers and reported alongside photographs of Stallone, who portrayed the "Rambo" character in a series of motion pictures. Despite plaintiffs' objection to this title, Judy Feeney herself referred to the movie story, in a *Donahue* broadcast, as "Rambo Goes Viking." Plaintiffs should hardly be heard to complain about a virtually identical reference. In any event, the Broadcast's "Rambo" references, which plaintiffs do raise in the complaint, are the type of hyperbolic speech which cannot be read to assert provable facts and is beyond the scope of defamation law. *See Milkovich*, 497 U.S. at 17, 110 S.Ct. at 2704–05; *Falwell*, 485 U.S. at 55, 108 S.Ct. at 881–82.

### E) *Sleeping Pills*

■■■ Plaintiffs claim that, in the Broadcast, NBC falsely implied that a CTU operative gave Erna Eyjolfsdottir sleeping pills the night plaintiffs attempted to leave Iceland with her daughters. The Broadcast simply includes an excerpt of an interview with Erna, in which she says that she had been drinking and someone gave her two capsules which would make her "feel good in the morning." Plaintiffs do not contest that CTU operatives engaged Erna in a night of drinking, and there is no statement in the

Broadcast that she was given sleeping pills. Even if such an implication reasonably did arise, it would be no more damning than the much clearer implication that plaintiffs attempted to get Erna drunk to facilitate their "rescue" of her children. *See Church of Scientology Int'l v. Time Warner, Inc.*, 932 F.Supp. 589, 593–95 (S.D.N.Y.1996) (Leisure, J.) (under subsidiary meaning doctrine, otherwise actionable statement must be dismissed if it implies the same ultimate conclusion as nonactionable statements in the publication); *see also Herbert v. Lando*, 781 F.2d at 312 (describing subsidiary meaning doctrine).

### 3. *Additional Allegations*

#### A) *NBC Departed From Normal Investigatory Standards*

■■■ Plaintiffs allege that NBC engaged in "highly unreasonable conduct" which constituted "an extreme departure from normal investigate standards" and supports a finding of "actual malice." As NBC properly points out, however, this is not an appropriate standard in public figure defamation cases. This "extreme departure" standard was proposed, as an alternative to the "actual malice" rule, in Justice Harlan's concurring opinion in *Curtis v. Butts*. Justice Harlan later acquiesced in the "actual malice" approach announced in *New York Times v. Sullivan*, and the Supreme Court ultimately rejected the "extreme departure" approach, *see Harte–Hanks*, 491 U.S. at 663–66, 109 S.Ct. at 2683–85. While that standard may apply in cases not implicating a heightened degree of First Amendment protection, it does not apply in this case.

#### B) *NBC Bore "Ill Will" Towards Plaintiffs*

■■■ Plaintiffs argue that Rhonda Schwartz, a *Dateline NBC* producer, and reporter Brian Ross harbored personal animus towards plaintiffs because they considered inviting a Dateline competitor, CBS' *60 Minutes*, to accompany them on a "rescue mission," and because *60 Minutes* may have considered covering the Icelandic criminal proceedings against Feeney and Grayson de-

spite Judy Feeney's promise to give Dateline an exclusive story. Plaintiffs allege that Schwartz and Ross felt "jilted," and set out "to prove the Feeneys dishonest" and portray them accordingly. Even if plaintiffs can show that such "ill will" existed, it would not be highly relevant in this defamation action. While "it cannot be said that evidence concerning motive ... never bears any relation to the actual malice inquiry," *Harte–Hanks,* 491 U.S. at 668, 109 S.Ct. at 2686, the Supreme Court has counseled that "courts must be careful not to place too much reliance on such factors." *Id.* "Actual malice," in the defamation context, refers to a defendant's knowledge of the falsity of the defamatory statements or a reckless disregard concerning their truth, not to any subjective ill will it may have borne the plaintiff. *See Masson,* 501 U.S. at 510, 111 S.Ct. at 2429 ("[a]ctual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will."); *Harte–Hanks,* 491 U.S. at 666 n. 7, 109 S.Ct. at 2685 n. 7 ("[t]he phrase 'actual malice' is unfortunately confusing in that it has nothing to do with bad motive or ill will.").

C) *Alleged Involvement of CBS' 60 Minutes*

■ In the Broadcast, NBC reported that plaintiffs told the Graysons, during the "rescue" operation, that they would need an extra $10,000 to hire a private plane so that a *60 Minutes* crew could join them on the mission. Olbia Grayson paid plaintiffs this additional sum, and Ginger Grayson is quoted in the Broadcast expressing skepticism about the veracity of the *60 Minutes* story. Plaintiffs claim NBC used this anecdote to imply they were dishonest.

Ginger and Brian Grayson apparently told NBC representatives they did not believe this story, partly because no private plane ever appeared. NBC's Rhonda Schwartz asserts that because the report did not appear to comport with normal practices in the field, and because *60 Minutes* was not among the American media outlets covering the Icelandic trial, she believed the story to be untrue. NBC also called *60 Minutes,* which denied

plaintiffs' story. Thus, even if the *60 Minutes* story were true, and to the extent the Broadcast goes beyond merely reporting the Graysons' views about it, no reasonable jury could find that NBC acted with "actual malice" in reporting it with skepticism.

### Conclusion

Plaintiffs' fundamental problem with the Broadcast is that, in their view, it should have portrayed the mission in a more favorable light. But so long as, in the overall context of the Broadcast, the facts reported are not false (or, if false, not broadcast with actual malice), plaintiffs are not legally entitled to be portrayed in the light they would understandably prefer. Furthermore, having viewed the Broadcast, the Court is far from convinced that the overall image of plaintiffs is as negative as they imagine. While plaintiffs' dissatisfaction may be understandable, it is not actionable.

The Court has reviewed all of plaintiffs' claims and finds them without merit for summary judgment purposes. For the foregoing reasons, NBC's motion for summary judgment is granted. The Clerk of the Court is directed to close this case.

SO ORDERED.