**Ilya D. LEVIN, Plaintiff–Appellant,**

v.

**John McPHEE; The New Yorker Magazine, Inc., and Farrar, Straus & Giroux, Inc., Defendants–Appellees.**

**No. 971, Docket 96–7408.**

United States Court of Appeals, Second Circuit.

Argued Jan. 7, 1997.

Decided July 17, 1997.

190

Erica B. Raved, UALR School of Law, Little Rock, AR, for Plaintiff-Appellant.

Leon Friedman, New York City, for Defendants-Appellees John McPhee and Farrar, Straus & Giroux, Inc.

Kevin W. Goering, New York City (Christine M. Hoey, Coudert Brothers, New York City; Devereux Chatillon, The New Yorker, New York City, on the brief), for Defendant-Appellee The New Yorker Magazine, Inc.

Before: FEINBERG, NEWMAN, and McLAUGHLIN, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

Libel law frequently calls for careful policing of the line that separates defamatory writings for which an author is properly liable from legitimate explorations of controversial episodes for which a journalist or historian must enjoy insulation from liability. The weighty interests of victims apprehending damaged reputations and of members of the public seeking an opportunity to make up their own minds weigh in the balance. The tension between those interests provides the context in which this appeal arises. The specific issue is whether, in the circumstances of this case, New York libel law permits imposition of liability upon an author who reports conflicting versions of the circumstances underlying a mysterious death and includes two versions that arguably implicate a named person. This issue arises on an appeal by Ilya D. Levin from the March 7, 1996, judgment of the United States District Court for the Southern District of New York (Lewis A. Kaplan, Judge), granting defendants' motion to dismiss and denying Levin's cross-motion for summary judgment.

Levin's complaint alleged that he had been defamed by the well known writer, John McPhee; Farrar, Straus & Giroux, Inc. ("Farrar"); and The New Yorker Magazine, Inc. ("New Yorker"), publisher of *The New Yorker* magazine (collectively "defendants"). Levin's allegations stemmed from McPhee's authorship of a book entitled *The Ransom of Russian Art,* Farrar's publication of the book, and New Yorker's reprint of an excerpt of the book in an article in *The New Yorker.* Two counts of the complaint alleged defamation, and a third alleged intentional infliction of emotional distress.

### Facts

**A. The Book**

*The Ransom of Russian Art* (hereinafter *"Ransom"* or "the book") recounts the story of Norton Dodge, an American, who for a thirty year period beginning in the 1950's, travelled throughout the Soviet Union meeting with and collecting the works of dissident Russian artists.[1] Dodge smuggled the works

---

1. [An] "unofficial artist," a "nonconforming artist," and therefore a "dissident artist" ...

out of the former Soviet Union, amassing the world's largest collection of such art at an expense to him of approximately $3,000,000.

One of the artists prominently featured in McPhee's story of Dodge's travels is Evgeny Rukhin, a prolific dissident painter.[2] Rukhin helped to arrange some of Dodge's clandestine meetings with other artists, accompanied Dodge on many of those encounters, and contributed much of his own work to Dodge's collection.

Plaintiff Ilya Levin, a writer and himself a former Russian dissident, is credited with helping to found the Leningrad chapter of Amnesty International. *See Dissident Pair Can Leave Soviet,* Baltimore Sun, June 22, 1977. Currently a resident of Washington, D.C., Levin fled the Soviet Union in 1977 after years of government persecution for his human rights activities and his Jewish identity.

Levin's complaint focuses on a ten-page chapter of McPhee's 181–page book that describes the circumstances surrounding Rukhin's death in a studio fire in Leningrad in 1976. Some facts about the fire, recounted in this chapter, are undisputed. When the fire broke out, Rukhin was in his studio with Levin; Evgeny Esaulenko, a writer; and Ludmila Boblyak ("Ludmila"), Esaulenko's wife. After the fire broke out, Levin and Esaulenko managed to escape; Rukhin and Ludmila were found dead in the studio.

The disputed aspects of Rukhin's death are set forth in eight pages of this chapter that recount interviews McPhee had with five people who knew Rukhin but were not at the scene of the fire. In five separately captioned "versions," each of the five tells McPhee what each believed and/or heard to be the facts concerning Rukhin's death. Levin asserts that the chapter defames him by accusing him of assisting the K.G.B. in

Rukhin's murder. Levin also complains that the chapter accuses him of cowardice.

The first section of this chapter, captioned "Dodge's Version," recounts an interview with Dodge in which Dodge " 'imagines' " the details of Rukhin's death. *Ransom* at 151. The text of the interview conveys Dodge's suspicion that the K.G.B. " 'probably' " burned the studio to teach Rukhin " 'an object lesson,' " unaware that Rukhin was then in the studio. *Id.* On the day of the fire, however, Rukhin was having a party at his studio with Levin, Esaulenko, and Ludmila. McPhee quotes Dodge as alleging that the fire department " 'held back' " since " 'burning [Rukhin's] place was a warning to all.' " *Id.* McPhee also attributes to Dodge, without exact quotation, the views

> that the death of Rukhin quickly became a story variously told, and with about as many versions as there were tellers, and since it was also a story seemingly known to silent narrators its mystery had been preserved.

*Id.*

Next, the same chapter recounts a version told by Alexander Melamid, a Russian artist. Melamid, like Dodge, did not witness the fire. In "Melamid's Version," McPhee quotes Melamid as reporting " 'two main versions' " of Rukhin's death: " '(1) K.G.B.' " and " '(2) He lived dangerously.' " *Id.* In Melamid's words,

> "Either God or the K.G.B. punished him. Was it intended that he die? It doesn't matter. Crime and punishment."

*Id.* at 152.

The third account, "Burke's Version," is attributed to Sarah Burke, an American who is said to have been romantically involved with Rukhin, *id.* at 136–37, and who was expecting a telephone call from him at the time of the fire, *id.* at 152. Burke offers

---

[is one of] the clandestine painters and sculptors of the Soviet Union in the era from Stalin to glasnost. They consisted of small, close circles, in Moscow and elsewhere, and those that did not have a covering occupation ... could be harassed not only as dissidents but as unemployed parasites and be sent to labor camps or mental hospitals, where some of them continued their artistic work.

*Ransom* at 5. "Official artists" were those whose works conformed to the state-advocated artistic style called "socialist realism." *See id.;* Christopher S. Wren, *Rukhin, Dissident Artist, Dies in Leningrad Studio Fire at 32,* New York Times, May 25, 1976.

**2.** According to the book, by the mid-seventies, Rukhin was the Russian artist most widely known in the United States. *Ransom* at 50.

three theories: (1) the K.G.B., (2) an accident, or (3) Rukhin's wife. Burke then elaborates on each version, and is quoted as saying:

> "The K.G.B. were following his movements pretty carefully. Some people think that Ilya Levin did it for them, that he was 'politically inspired.' It's a possibility.... No one knows where the fire started. Buckets with oily rags in them were always on the stairs. Someone could have thrown a match in. Artists really ran scared after that. Most people believe that the fire was set, but I think it could have been an accident—the studio full of vodka, cigarettes, and the chemically soaked rags. Of the four, two ran. They didn't call the fire department. Esaulenko ran. His wife died. [Rukhin] died.... The other who ran was Ilya Levin. Some people think that [Rukhin's wife] did it, because [Rukhin] meant to leave and come to the United States."

*Id.* at 152.

The fourth version is told by a person McPhee identifies as "the poet Kuzminsky," *id.* at 137, a friend of Rukhin's, *id.* "Kuzminsky's Version" rejects any possibility that the fire was an accident, but concedes that the incident is still a mystery. *Id.* at 153. Kuzminsky claims to have made a " 'careful investigation.' " *Id.* After offering a description of the floor plan of Rukhin's studio, Kuzminsky relates that Esaulenko was drinking and dozing in one room of the studio while Levin, Rukhin, and Esaulenko's wife were having sexual intercourse together, " 'sandwich-style' " in another. *Id.* The fire started in a storage room on the other side of the stairs, blocking the exit immediately. Kuzminsky offers an "imagin[ed]" version of what happened when the K.G.B. entered the studio and encountered the threesome in bed together:

> "Maybe Esaulenko opened the door. Maybe they used their own keys. When they came to the last room, seeing the lady intercoursing with two fellows, I know what those K.G.B. prudists would think. They said something nasty. Ludmila attacked them. They hit her. Even if a lady strikes them they answer with a good professional blow. Rukhin defended her.

> They hit him. Then they set the fire. [Rukhin's wife] says that when they put Rukhin in the ambulance he was alive. They finished him there. Levin and Esaulenko are selfish cowards. They never will protect anybody."

*Id.* at 154.

The final version is told by Rukhin's wife, Galina, who was at home with her children when she learned about the fire. In "Galina's Version" she recounts that bystanders told her that two men appeared in the studio windows, one holding a purse. The two managed to escape the fire by using a ladder. From the bystanders' description, she knew that one of the two men was Esaulenko. The bystanders told her that that man said that they should wait twenty minutes before calling her. The two men promptly left the scene. At the morgue, Galina identified the body of her husband and that of Esaulenko's wife, Ludmila. Galina immediately suspected that the deaths were not accidental:

> Galina went straight to the K.G.B., and said, "I saw him at the morgue. I know he was killed. I saw it in his face."

*Id.* at 156.

"Galina's Version" explicitly accuses Esaulenko:

> Galina went to Ludmila's funeral, in St. Vladimir's Cathedral. Ludmila in her coffin "had a blue face, and black marks on her throat." Galina was startled to see Esaulenko there. "I said to him, 'What are you doing here, murderer?' " After pausing as she tells the story, she adds distractedly, "He left her [Ludmila] but took her purse. He went down the ladder with her purse."

*Id.* at 157. Galina also states that a doctor and a medical student who examined Rukhin's body later told her that her husband had been murdered by drug injection before the fire. McPhee quotes her as making the following surmise:

> "Ludmila probably rebelled and was choked when she refused to cooperate with

the murderers.... They burned out the studio to cover the murder."

*Id.* at 157.

"Dodge's Version" places Levin in the apartment at the time of the fire, which is undisputed, but makes no accusation against him. "Malimid's Version" makes no accusation against Levin. "Kuzminsky's Version" accuses Levin, along with Esaulenko, of cowardice in not protecting Rukhin. "Burke's Version" reports that some people think that Levin committed Rukhin's murder for the K.G.B., and adds her view that this theory is a possibility. "Galina's Version" makes no explicit allegation against Levin, but, by alleging that Rukhin was murdered before the fire, labeling Esaulenko a murderer, and referring to "murderers," arguably implies complicity by Levin, who was present with Esaulenko. Apart from the references in this chapter, Levin is not mentioned elsewhere in the book.

## B. The Article

McPhee's article in *The New Yorker*, also entitled "The Ransom of Russian Art," appeared in the October 17, 1994, issue, a few weeks before publication of the book. In excerpts from the book, the article relates how Dodge amassed his collection of Russian art. The article includes all of "Dodge's Version" and portions of "Galina's Version" of Rukhin's death. The excerpt of "Galina's Version" does not mention Levin by name, but states that Esaulenko and another man escaped the fire, that Esaulenko told the neighbors to wait before calling Galina, that Rukhin was killed before the fire, that she called Esaulenko a murderer, that Ludmila was probably choked by "the murderers" when she refused to cooperate, and that the fire was set to cover up the murder.

### Proceedings in the District Court

Levin's complaint alleged that the book and the article were defamatory because they falsely implicated him in Rukhin's death, and

stated or implied that he was involved with the K.G.B. In addition, Levin complained that the statement in "Kuzminsky's Version" accusing him of cowardice was false and defamatory. Finally, Levin asserted a cause of action for intentional infliction of emotional distress.

Defendants moved to dismiss, contending that as a matter of law the statements about Levin were not susceptible of defamatory meaning, and that the statements were all statements of opinion, rather than statements of fact. McPhee and New Yorker further argued that in any event the statements were substantially true and to the extent that they were false, the statements caused Levin only incremental harm. McPhee and Farrar also defended on the ground of the privilege of neutral reportage. Levin cross-moved for summary judgment on the issue of whether the statements were capable of defamatory meaning, and in the alternative requested leave to amend the complaint.

Though Judge Kaplan agreed with plaintiff that the statements were susceptible of defamatory meaning, he also concluded that

> McPhee's signals were clear enough to alert readers that his discussion of the fire at Rukhin's studio contained speculation derived from the facts presented. The Court holds that, at worst a reasonable reader could conclude only that McPhee was of the opinion, based on the facts presented, that plaintiff might have been involved with the K.G.B. in causing Rukhin's and [Ludmila's] deaths.

*Levin v. McPhee*, 917 F.Supp. 230, 241–42 (S.D.N.Y.1996). Thus, Judge Kaplan agreed with defendants that the references to Levin were protected expressions of opinion. The District Court therefore granted the defendants' motion to dismiss the complaint.[3]

### Discussion

Defendants assert (i) that the statements are not defamatory as a matter of law, and

---

3. Levin has failed to challenge Judge Kaplan's disposition of his claim for intentional infliction of emotional distress. We therefore treat that claim as abandoned. We also decline to consider Levin's claim, asserted for the first time on

appeal, that he is entitled to damages for the defendants' use of his name for commercial gain. *See* New York Civil Rights Law §§ 50, 51 (McKinney 1992).

(ii) that the statements are protected expressions of opinion. Applying the usual standards applicable to an appeal from a Rule 12(b)(6) dismissal, we turn to the law applicable to those theories and the plaintiff's claim, and we evaluate the plaintiff's well-pleaded allegations with reference to that law.[4]

## A. Defamatory Meaning

■■■ Libel law provides redress for injuries to a person's reputation, *see* Bruce W. Sanford, *Libel and Privacy* § 4.1 (2d ed. Supp.1993) [hereinafter, Sanford, *Libel and Privacy* ], caused by statements that "tend[ ] to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number in the community," *Tracy v. Newsday, Inc.,* 5 N.Y.2d 134, 136, 182 N.Y.S.2d 1, 3, 155 N.E.2d 853, 854 (1959); *see Kimmerle v. New York Evening Journal,* 262 N.Y. 99, 102, 186 N.E. 217 (1933) ("Reputation is . . . injured by words which tend to expose one to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation or disgrace, or to induce an evil opinion of one in the minds of right-thinking persons . . . ."). It is the responsibility of the jury to determine whether the plaintiff has actually been defamed, *e.g., James v. Gannett Co.,* 40 N.Y.2d 415, 419, 386 N.Y.S.2d 871, 874, 353 N.E.2d 834, 837–38 (1976); however, a threshold issue for resolution by the court is whether the statement alleged to have caused plaintiff an injury is reasonably susceptible to the defamatory meaning imputed to it. *Id.* at 419, 386 N.Y.S.2d at 874, 353 N.E.2d at 837–38; *Orr v. Lynch,* 60 A.D.2d 949, 401 N.Y.S.2d 897, 899 (3d Dep't), *aff'd,* 45 N.Y.2d 903, 411 N.Y.S.2d 10, 383 N.E.2d 562 (1978); *see Cianci v. New Times Publishing Co.,* 639 F.2d 54, 59 (2d Cir.1980). The court's threshold inquiry is guided not only by the meaning of the words as they would be commonly understood, *id.* at 60, but by the words

considered in the context of their publication, *see Armstrong v. Simon & Schuster, Inc.,* 85 N.Y.2d 373, 381, 625 N.Y.S.2d 477, 481, 649 N.E.2d 825, 829 (1995); *James,* 40 N.Y.2d at 420, 386 N.Y.S.2d at 875, 353 N.E.2d at 838. "The construction which it behooves a court of justice to put on a publication which is alleged to be libellous is to be derived as well from the expressions used as from the whole scope and apparent object of the writer." *Id.* at 421, 386 N.Y.S.2d at 875, 353 N.E.2d at 838 (citation and internal quotation marks omitted).

■■ In the instant case, the motion to dismiss asserts that as a matter of law, neither the book nor the magazine article are reasonably susceptible of a defamatory meaning. Particularly with respect to the book, that assertion is untenable. A fair reading of "Burke's Version" implicates Levin with the K.G.B. in causing Rukhin's death. Likewise, "Galina's Version", in which she surmises that Ludmila was "choked when she refused to cooperate with the murderers" could be fairly read as implying that Esaulenko and Levin were those murderers. Such implications, whether made by the writer himself or attributed to others, are statements that could convey a defamatory connotation. *See Cianci,* 639 F.2d at 60–61 (noting that one who republishes statements made by others is as liable as if he made the statements himself).

That the statements implicating Levin in a murder appear among conflicting and speculative versions of an unresolved mystery reflects only that a jury issue exists as to how "the words were likely to be understood by the ordinary and average reader," *see James,* 40 N.Y.2d at 420, 386 N.Y.S.2d at 874, 353 N.E.2d at 837 (quoting *Mencher v. Chesley,* 297 N.Y. 94, 100, 75 N.E.2d 257 (1947)), and does not preclude a trier of fact from finding a defamatory connotation, *id.* at 420, 386 N.Y.S.2d at 874, 353 N.E.2d at 837–38.

---

4. In a footnote to his brief, Levin complains that It is . . . unfair that, having decided that New York law applies, the District Court has permitted national publishers based in New York to reach out with impunity and destroy the life of an unsuspecting and innocent person quietly living his life in the District of Columbia,

where the laws of that [District] would have given him respite.

Brief for Appellant at 28 n.5. We do not believe that this footnote is an attempt to seek review of Judge Kaplan's choice-of-law ruling, and we will not treat it as such.

■] As for the *New Yorker* article, the matter is less clear. However, we conclude that the article contains a discernible implication, among others, that Levin was one of "the murderers" referred to in "Galina's Version." Because defamatory meaning is drawn from the words used and their context, we cannot ignore the implications about Levin from assertions made in the article, read in conjunction with the fact that Levin was at the scene. Thus, while the excerpt of "Galina's Version" makes no mention of Levin, his identity as one of the "murderers" is potentially revealed by the circumstances of his escape from the fire with Esaulenko, whom Galina explicitly labels a murderer.[5]

### B. Fact or Opinion

■] Because expressions of opinion are not actionable, the disposition of defamation actions frequently turns on the issue of whether the defendant's words constituted actionable assertions of fact or protected expressions of opinion. Categorizing a defendant's statements as either fact or opinion, however, is often not an easy task. As one commentator has noted, "No area of modern libel law can be murkier than the cavernous depths of this inquiry." *See* Sanford, *Libel and Privacy* § 5.1 (Supp.1997); *see also Brian v. Richardson,* 87 N.Y.2d 46, 52, 637 N.Y.S.2d 347, 350, 660 N.E.2d 1126, 1129 (1995). In New York, resolution of the fact/opinion issue is a matter for the court. *See Gross v. New York Times Co.,* 82 N.Y.2d 146, 154, 603 N.Y.S.2d 813, 817, 623 N.E.2d 1163, 1167 (1993).

■] New York courts have developed a three-stage inquiry to distinguish statements of fact from statements of opinion. The first stage of inquiry involves a consideration of whether the specific language used has a precise and readily understood meaning. Second, the court determines whether the statements are susceptible of being proven false. At the third stage, the court evaluates

whether the context of the statements signals to the reader that what is being conveyed is likely to be opinion rather than fact. *Id.*

The Supreme Court, in *Milkovich v. Lorain Journal,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), explained that the United States Constitution offers no wholesale protection for so-called "expressions of opinion" if those expressions imply assertions of objective fact. *Id.* at 18, 110 S.Ct. at 2705–06. The Court also reiterated the rule that when statements are within the category of "rhetorical hyperbole" or "imaginative expression," those statements are not actionable because they "cannot 'reasonably [be] interpreted as stating actual facts.'" *Id.* at 20, 110 S.Ct. at 2706 (alteration in original) (citation omitted).

The New York Court of Appeals, however, has expressed its belief that "an analysis that begins by looking at the content of the whole communication, its tone and apparent purpose better balances the values at stake than an analysis that first examines the challenged statements for express and implied factual assertions, and finds them actionable unless couched in loose, figurative or hyperbolic language." *Immuno AG. v. Moor–Jankowski,* 77 N.Y.2d 235, 255, 566 N.Y.S.2d 906, 917, 567 N.E.2d 1270, 1281 (1991) (citation omitted).

■] While New York's tripartite inquiry therefore does and is intended to differ from the inquiry required under the First Amendment, *see Brian,* 87 N.Y.2d at 52, 637 N.Y.S.2d at 350–51, 660 N.E.2d at 1129–30; *Moor–Jankowski,* 77 N.Y.2d at 255, 566 N.Y.S.2d at 917, 567 N.E.2d at 1281, we note that the thrust of the dispositive inquiry under both New York and constitutional law is "whether a reasonable [reader] could have concluded that [the publications were] conveying facts about the plaintiff," *Gross,* 82 N.Y.2d at 153, 603 N.Y.S.2d at 817, 623 N.E.2d at 1167 (internal quotation marks and

---

5. We neither consider nor decide the question of what is the proper standard to be applied to a motion to dismiss a claim of "defamation by implication." *See Armstrong,* 85 N.Y.2d at 381–82, 625 N.Y.S.2d at 481–82, 649 N.E.2d at 829–30 ("The choice of an appropriate test ... must [] wait for another day."). Defamation by impli-

cation involves "false suggestions, impressions and implications arising from otherwise truthful statements," *id.* at 381–82, 625 N.Y.S.2d at 481, 649 N.E.2d at 829, and differs from the allegedly "false statements of verifiable fact, with inferences flowing from those facts," *id.* of which Levin here complains.

citation omitted) (first alteration in original). Instead of parsing out and evaluating the challenged statements in isolation, New York courts look to the immediate context and the broader social context of the statement, *see Brian*, 87 N.Y.2d at 52, 637 N.Y.S.2d at 348–49, 660 N.E.2d at 1127–28 (explaining *Moor–Jankowski*, 77 N.Y.2d at 254, 566 N.Y.S.2d at 916, 567 N.E.2d at 1280); *Gross*, 82 N.Y.2d at 153, 603 N.Y.S.2d at 819, 623 N.E.2d at 1169, and evaluate the impact that the statements would have on a reasonable reader, *see Moor–Jankowski*, 77 N.Y.2d at 254, 566 N.Y.S.2d at 917, 567 N.E.2d at 1281. When the defendant's statements, read in context, are readily understood as conjecture, hypothesis, or speculation, this signals the reader that what is said is opinion, and not fact. *See Gross*, 82 N.Y.2d at 155, 603 N.Y.S.2d at 818, 623 N.E.2d at 1168.

 Though some statements may be characterized as hypothesis or conjecture, they may yet be actionable if they imply that the speaker's opinion is based on the speaker's knowledge of facts that are not disclosed to the reader. *Id.* at 154, 603 N.Y.S.2d at 818, 623 N.E.2d at 1168 (citing Restatement (Second) of Torts § 566 (1977)). On the other hand, if a statement of opinion either discloses the facts on which it is based or does not imply the existence of undisclosed facts, the opinion is not actionable. *Id.* at 154, 603 N.Y.S.2d at 818, 623 N.E.2d at 1168.

 *Ransom* is a nonfiction work, primarily presenting the story of how Norton Dodge amassed his renowned art collection during an intriguing and dangerous era in the Soviet Union. Though the overall content of the book generally informs the reader that the book describes factual and historical accounts of real events, McPhee uses a number of clear signals to indicate to the reader that the versions of the events surrounding the studio fire were nothing more than conjecture and speculation.

The book describes the studio fire as an incident that remains shrouded in mystery even to the present day. The differing accounts of what either did or might have happened are explicitly presented as "versions." These versions are told by people who were personally acquainted with the painter and therefore might be expected to have their own personal theories regarding the mystery. The continuing mystery of the incident is compounded not only by the conflict among the versions as to how and why the fire started,[6] but also by inconsistencies within what was said by each of the individuals interviewed. Moreover, not one of the versions is related by a person with first-hand knowledge of what happened that day, and the book expressly reports that "Dodge's Version" and "Kuzminsky's Version" are "imagined." All of these considerations combine to place any allegation of Levin's possible involvement in a murder in the category of opinion—opinion based on speculation without any implication of fact. The accusation of cowardice appears only in Kuzminsky's explicitly labeled "imagined" version, and therefore could not be viewed as anything other than conjecture. Our conclusions about the book apply equally to the *New Yorker* article. Both the book and the article emphasize that the facts underlying the studio fire and Rukhin's death remain unknown, and a reasonable reader would understand that any allegations of murder, especially any implicating Levin, are nothing more than conjecture and rumor.

## Conclusion

The judgment of the District Court is affirmed.

---

6. Among those versions are the following: (1) the K.G.B. set the studio on fire to teach Rukhin a lesson ("Dodge's Version"); (2) God punished Rukhin for his lifestyle ("Kuzminsky's Version"); (3) the K.G.B. murdered Rukhin, possibly with Levin's help ("Burke's Version"); (4) an accident ("Burke's Version"); (5) the K.G.B. murdered Rukhin ("Kuzminsky's Version"); and (6) the K.G.B. did it with the help of Esaulenko, and by implication, Levin ("Galina's Version").