## Lou DIBELLA and DiBella Entertainment, Inc., Plaintiffs,

v.

## Bernard HOPKINS, Defendant.

### No. 01 CIV. 11779(DC).

United States District Court, S.D. New York.

March 6, 2002.

---

Judd Burstein, P.C., By Judd Burstein, Esq., Peter B. Schalk, Esq., New York, NY, for Plaintiffs.

Cozen O'Connor, By Robert W. Hayes, Esq., Marlo Pagano–Kelleher, Esq., Gary L. Leshko, Esq., New York, NY, for Defendant.

### MEMORANDUM DECISION

CHIN, District Judge.

In this diversity case, plaintiff Lou Di-Bella, a boxing advisor, matchmaker, and television packager formerly employed by the cable network Home Box Office ("HBO"), alleges that he was defamed by defendant Bernard Hopkins, the professional boxer. Hopkins became the undisputed middleweight champion of the world on September 29, 2001, when he beat Felix Trinidad by a final round technical knockout. That fight was the culmination of DiBella's efforts to promote and develop Hopkins's boxing career. Within weeks after the fight, however, Hopkins terminated his relationship with DiBella. Hopkins then publicly accused DiBella of improper conduct. He told several reporters that while DiBella was still employed by HBO, DiBella had asked him for—and he had paid DiBella—$50,000 to arrange for his fights to be televised on HBO. These were, in Hopkins's own words, "some serious, serious allegations." One sports writer observed that Hopkins was alleging that he had paid DiBella "payoffs" that amounted to "bribes." Another wrote that Hopkins had alleged that DiBella had "demanded under-the-table fees to secure dates on HBO."

DiBella contends that Hopkins's accusations were false. He denies that he engaged in any wrongful conduct and he denies that he received any monies from Hopkins while he was still employed at HBO. He alleges that his name and reputation have been tarnished by Hopkins's comments. Consequently, he and his company, DiBella Entertainment, Inc. ("DiBella Inc."), bring this defamation action for damages. In addition, they contend that they were not paid for the reasonable value of services they rendered to Hopkins and thus they also assert a claim for quantum meruit.

Hopkins moves to dismiss the first amended complaint, arguing that this Court has no jurisdiction over him and that DiBella has failed to state a claim under New York law for defamation or quantum meruit. Assuming, as I must, that the allegations of the first amended complaint are true for purposes of this motion, I hold that this Court has personal jurisdiction over Hopkins and that plaintiffs have stated claims upon which relief can be granted. Accordingly, and for the reasons set forth below, Hopkins's motion to dismiss the first amended complaint is denied.

Also before the Court is plaintiff's cross-motion for leave to file a second amended complaint to add a defamation claim based on allegedly defamatory statements made

by Hopkins about DiBella after the first amended complaint was filed. As discussed below, the cross-motion for leave to file a second amended complaint is granted.

## BACKGROUND

For purposes of this motion, the facts alleged in the complaint are assumed to be true. They are as follows:

### A. *The Parties*

DiBella was one of the primary architects of HBO's boxing program, which is considered to be "the best in the business." (First Am. Compl. at ¶ 6). In 1999, DiBella began to consider leaving HBO. (*Id.* at ¶ 9). He started negotiating possible terms for his departure with HBO and stopped "performing substantive services" for HBO in early 2000. (*Id.*). DiBella stopped reporting to HBO's offices for work by early April of 2000, and on May 12, 2000, DiBella and HBO signed a termination agreement formalizing his departure. (*Id.* at ¶¶ 6, 9). DiBella now works in the boxing world as an independent advisor, matchmaker, and television packager. (*Id.* at ¶¶ 6, 9). DiBella founded DiBella Inc., a New York corporation, on May 5, 2000. (*Id.* at ¶ 7). DiBella is a New York resident. (*Id.* at ¶ 6).

Hopkins has been undefeated since 1993. (*Id.* at ¶ 1). Hopkins has had difficulty obtaining fights with worthy opponents, however, because of, among other things, his "vocal criticisms of boxing [and] his conflicts with Don King." (*Id.* at ¶¶ 1, 13). Hopkins resides in Delaware. (*Id.* at ¶ 8).

### B. *DiBella's Efforts for Hopkins*

In the spring of 2000, DiBella began assisting Hopkins with his career. DiBella had not yet left HBO, but DiBella's colleagues at HBO were aware of and consented to DiBella's work for Hopkins. (*Id.*

at ¶ 11). DiBella worked for Hopkins "with the understanding that he would be compensated for doing so." (*Id.* at ¶ 13). Moreover, "it was understood between Hopkins and DiBella that in 2001, when Hopkins entered into a promotional agreement with Don King Promotions, Inc. ("DKP"), DiBella Entertainment would provide services for Hopkins through the conclusion of Hopkins's promotional contract with DKP and be compensated therefor." (*Id.* at ¶ 13). Hopkins did not pay DiBella while DiBella was employed at HBO. (*Id.* at ¶ 4).

DiBella loaned money to Hopkins to assist in training for the Syd Vanderpool fight on May 13, 2000. Hopkins repaid the loan on May 19, 2000—after defeating Vanderpool and after DiBella had left HBO. Hopkins went on to fight Keith Holmes and Trinidad, and DiBella assisted in scheduling both those events. (*Id.* at ¶ 20). Hopkins paid DiBella some compensation for his assistance, but Hopkins made no payments to DiBella while he was still employed by HBO. (*Id.* at ¶ 14).

### C. *Hopkins's Statements*

On or about December 19, 2001, Hopkins made the following statements to Steve Kim, a reporter for Maxboxing.com:

Understand, every time I fought, Lou DiBella got paid, even when he was with HBO, which is f* *king wrong. What I'm saying is that the bottom line is, the Syd Vanderpool fight, should an HBO employee accept $50,000 while he's still working for HBO ... Ask HBO why an employee of their company asked me to give him $50,000? And I paid him too. Now, is that ethically right? You think Time Warner wants to hear about that? What I'm telling you right now is some serious, serious allegations, but these guys here try to make it seem like I'm the bad guy and Lou is probably whis-

pering stuff around, too, probably, but he probably isn't saying anything openly. And that influence can hurt me when I get to HBO, being friends with the people over there.

(*Id.* at Ex. B).

Kim published the statements in an article on the Internet at Maxboxing.com on December 20, 2001. (*Id.* at Ex. B). On or about December 21, 2001, in an interview with the *Boston Globe,* Hopkins claimed that he had paid DiBella $50,000 to get him on HBO:

I ain't no snitch but I can back it up.... This is a filthy, filthy game and you gotta be filthy to be in it ....

Nobody in this game does anything for nothing. I'm 36. I got no HBO contract. I can get on a card to make $500,000 if I give him [DiBella] $50,000. Why not? I didn't really see anything wrong with it. It's boxing ....

I ain't lying about nothing .... I got the evidence right here on my coffee table. The wire transfers. The voided check. I know I ain't crazy. To get on that [HBO] card the fee was $50,000. Paying it was a no-brainer.

(*Id.* at Ex. A). The statements were published in the *Boston Globe* on December 24, 2001. (*Id.*).

In late December 2001, Hopkins also made the following statements to one or more reporters, as reported in the *Las Vegas Review–Journal* on December 23, 2001:

Lou DiBella ... lobbied for HBO while he was there and convinced them Bernard would be a good undercard fight with the hopes of [Roy] Jones and Hopkins maybe fighting. In doing that, I paid him. I wired him $50,000.

(*Id.* at Ex. D).

On December 22, 2001, a sportswriter for the *New York Daily News* wrote about the statements Hopkins had made to the media:

Hopkins alleged that he paid DiBella to get him fights on HBO when DiBella still worked for the cable network. Those payoffs amounted to bribes ....

Hopkins offered no proof of payoffs to DiBella while he was at HBO. But if Hopkins's allegation is true, it would be one of the biggest scandals in the sport since it was determined that the boxer ratings were rigged for a tournament on NBC back in the 1970's.

(*Id.* at Ex. C).

Another sportswriter observed in the *Philadelphia Daily News* on January 10, 2002, that in his statements Hopkins alleged in essence that DiBella "demanded under-the-table fees to secure dates on HBO." (*Id.* at Ex. E). He quoted Hopkins as saying:

When the guy [DiBella] says, 'I got HBO dates, you give me this and I'll get you one,' what am I supposed to do? ... But it got to be where [DiBella] wouldn't back off. Let the closet doors open and the skeletons will come out.

(*Id.*).

After the filing of the first amended complaint in this action, Hopkins gave an interview to Rich Marata of the ESPN Radio Network, which was aired on February 1, 2002. Hopkins asked himself rhetorical questions and then immediately provided the answers, saying: "Hey, did you or did you not give $50,000 to an employee from HBO to be an undercard? Yes, I[did]. Do you have anything? Yes I have. Here is right here. Now, whatever you wanna take from, well, you know that's criminal, right?" (Proposed Second Am. Compl. at ¶ 40).

## D. *This Action*

This action was commenced on December 21, 2001. The original complaint contained claims for libel per se, breach of contract, and quantum meruit. Plaintiffs subsequently amended their complaint, dropping the breach of contract claim.

This motion to dismiss followed. Plaintiffs also filed a cross-motion for leave to amend the first amended complaint pursuant to Rule 15 of the Federal Rules of Civil Procedure to add the ESPN radio interview to the defamation claim.

## *DISCUSSION*

## A. *Defendant's Motion*

Hopkins moves to dismiss the first amended complaint pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. Hopkins contends that this Court lacks personal jurisdiction over him. On the merits, he contends first that the defamation claim must be dismissed because his statements were not defamatory because they were "true" and they were "mere statements of opinion that [were] validly held." (Def. Mem. at 2). Second, he contends that the quantum meruit claim fails to state a claim upon which relief may be granted and that it is barred by the applicable statute of frauds.

### 1. *Personal Jurisdiction*

### a) *Applicable Law*

■ In a diversity action, personal jurisdiction is determined by the law of the state in which the district court sits. *Wilcock v. Equidev Capital L.L.C.*, No. 99 Civ. 10781(DC), 1999 WL 1129068, at *1 (S.D.N.Y. Dec.9, 1999) (citation omitted). Hence, the jurisdictional question is thus governed by New York law. "On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has juris-

diction over the defendant." *Kernan v. Kurz–Hastings, Inc.*, 175 F.3d 236, 240 (2d Cir.1999) (citation omitted).

Hopkins is not a New York resident and is not alleged to have a presence here. Furthermore, the allegedly defamatory statements were not made in New York. Therefore, the question is whether long-arm jurisdiction exists. Although certain provisions of New York's long-arm statute specifically exclude actions for defamation, *see* N.Y.C.P.L.R. §§ 302(a)(2), (3) (McKinney 2001), no such exclusion exists for cases where the defamation complained of arises from or is connected with the transaction of business within the state. *See* N.Y.C.P.L.R. § 302(a)(1) (McKinney 2001); *see, e.g., Popper v. Monroe*, No. 87 Civ. 0899(SWK), 1990 WL 129168, at *2 (S.D.N.Y. Aug.29, 1990).

■ Section 302(a)(1) sets forth a two-prong test for determining personal jurisdiction. It provides that a court may exercise personal jurisdiction over any non-domiciliary "who in person or through an agent ... transacts any business within the state or contracts anywhere to supply goods or services in the state," but only "[a]s to a cause of action arising from" the transaction in question. N.Y.C.P.L.R. § 302(a)(1) (McKinney 2001). In other words, a plaintiff seeking to rely on § 302(a)(1) must show first that the defendant transacted to supply goods or services in the state and second that the cause of action arises from that transaction. "Even one instance of purposeful activity directed at New York is sufficient to create jurisdiction, whether or not defendant was physically present in the State, as long as that activity bears a substantial relationship to the cause of action." *Corporate Campaign, Inc. v. Local 7837, United Paperworkers Int'l Union*, 265 A.D.2d 274, 697 N.Y.S.2d 37, 39 (1999).

Moreover, a non-domiciliary who takes advantage of "New York's unique resources in the entertainment industry" purposefully avails himself of the benefits of conducting business in the state, such that long-arm jurisdiction may be asserted if the cause of action arises out of the transaction in question. *World Wrestling Fed'n Entm't, Inc. v. Bozell*, 142 F.Supp.2d 514, 533 (S.D.N.Y.2001) (quoting *Courtroom Television Network v. Focus Media, Inc.*, 264 A.D.2d 351, 695 N.Y.S.2d 17, 19–20 (1999)).

At the pleadings stage of a case, a plaintiff is required only to make a prima facie showing of jurisdiction. Fed.R.Civ.P. 12(b)(2). In determining whether the plaintiff has met this burden, the Court must assume that all of the plaintiff's factual allegations are true, and "doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir.1993) (citing *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir. 1985)) (further citation omitted). On a Rule 12(b)(2) motion, "the court may provisionally accept disputed factual allegations as true." *Credit Lyonnais Securities (USA) Inc. v. Alcantara*, 183 F.3d 151, 153 (2d Cir.1999).

### b) *Application*

■ Here, as to the first prong, plaintiffs have alleged that Hopkins, either in person or through an agent, has transacted business within the state—he contracted to have one (or more) of his fights aired on HBO. Hence, plaintiffs have alleged sufficient purposeful activity by Hopkins in and directed at New York to establish personal jurisdiction over him.

DiBella states that he met with Hopkins and others in New York on "multiple occasions" in 2000 and 2001 to negotiate various fight-related agreements with HBO Sports. (DiBella Aff. at ¶ 2). HBO's principal place of business is in New York. (First Am. Comp. ¶ 42). Hopkins acknowledges that he met with "HBO personnel or other individuals associated with the professional boxing industry in the state of New York." (Hopkins Verification at ¶ 10). Hopkins eventually entered into contracts with HBO containing New York choice of law provisions. (Mozarsky Verification at ¶ 3). Although the fight in question—the Syd Vanderpool fight—was held in Indianapolis (Hopkins Verification at ¶ 6), it was aired on HBO. Moreover, after DiBella Inc. was established in New York, the company negotiated and packaged fight deals for Hopkins and "handled many aspects of Hopkins's professional life," including negotiations for Hopkins's contract with DKP. (DiBella Aff. at ¶ 4).

As to the second prong, plaintiffs' claims in this case arise out of Hopkins's business activity in New York. Hopkins's statements relate to his efforts to establish a relationship with HBO and the services that DiBella eventually provided to Hopkins in connection with HBO. (First Am. Compl. at ¶¶ 11–17). Hopkins sought to purposefully avail himself of the benefits of conducting business in the state by seeking to take advantage of New York's "unique resources" in the entertainment and sports fields, and as plaintiffs' claims arise out of that purposeful activity, this Court may exercise long-arm jurisdiction over him.

### 2. *The Merits*

### a) *Rule 12(b)(6)*

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court "must accept the material facts alleged in the complaint as true and construe all reasonable inferences in plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d

133, 136 (2d Cir.) (citation omitted), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994). A motion to dismiss should be granted "only if it appears beyond doubt that the claimant can prove no set of facts which would entitle him to relief." *Belly Basics, Inc. v. Mothers Work, Inc.,* 95 F.Supp.2d 144, 145 (S.D.N.Y.2000). On a motion to dismiss, the Court's function is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985) (citation omitted). The Court may consider "facts stated on the face of the [pleading] and in documents appended to the complaint or incorporated in the [pleading] as well as [ ] matters of which judicial notice may be taken." *Scholastic, Inc. v. Stouffer,* 124 F.Supp.2d 836, 841 (S.D.N.Y.2000) (quoting *Automated Salvage Transport, Inc. v. Wheelabrator Environmental Systems, Inc.,* 155 F.3d 59, 67 (2d Cir.1998)).

### b) *Defamation*

#### (i) *Applicable Law*

■ To state a claim for defamation under New York law,[1] "the claimant must allege facts sufficient to support a finding of a published statement concerning the claimant that is both false and defamatory." *Cytyc Corp. v. Neuromedical Sys., Inc.,* 12 F.Supp.2d 296, 301 (S.D.N.Y.1998). Ultimately, New York law requires a libel plaintiff to prove five elements: "(1) a written defamatory statement of fact regarding the plaintiff; (2) published to a third party by the defendant; (3) defendant's fault, varying in degree depending on whether plaintiff is a private or public party; (4) falsity of the defamatory statement; and (5) injury to plaintiff." *Meloff*

*v. New York Life Ins. Co.,* 240 F.3d 138, 145 (2d Cir.2001) (citation omitted). A plaintiff who is a public figure must establish that the defendant made the statements with actual malice. *New York Times v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). "Liability requires clear and convincing evidence of a knowing falsehood or 'subjective awareness of probable falsity.' " *Contemporary Mission, Inc. v. New York Times Co.,* 842 F.2d 612, 621 (2d Cir.) (quotation and citations omitted), *cert. denied, O'Reilly v. New York Times Co.,* 488 U.S. 856, 109 S.Ct. 145, 102 L.Ed.2d 117 (1988). Under New York law "it is 'fundamental that truth is an absolute, unqualified defense to a civil defamation action,' and 'substantial truth suffices to defeat a charge of libel.' " *Weber v. Multimedia Entertainment, Inc.,* No. 97 Civ. 0682(JGK), 2000 WL 526726, *10 (S.D.N.Y. May 2, 2000) (quoting *Guccione v. Hustler Magazine, Inc.,* 800 F.2d 298, 301 (2d Cir. 1986)).

■ Statements of subjective opinion are not actionable under New York law. *Protic v. Dengler,* 46 F.Supp.2d 277, 281 (S.D.N.Y.), *aff'd,* 205 F.3d 1324, 1999 WL 1254506 (2d Cir.1999). "There is no bright line test to aid in determining whether a statement is one of opinion or fact, as 'expressions of 'opinion' may often imply an assertion of objective fact.' " *Belly Basics,* 95 F.Supp.2d at 145 (quoting *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 18, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)). New York law does, however, prescribe a three-factor test to determine whether a statement is a statement of fact or a statement of opinion: "(1) whether the challenged statements have a precise and readily understood meaning; (2) whether the statements are susceptible of being proven false; and (3) whether the context

---

**1.** Both sides apply New York law in discussing the merits.

signals to the reader that the statements are more likely to be expressions of opinion rather than fact." *Cytyc Corp.*, 12 F.Supp.2d at 301–02. The determination of whether a statement is one of fact or of opinion "is a question of law for the court." *Protic*, 46 F.Supp.2d at 281 (citing *Levin v. McPhee*, 119 F.3d 189, 196 (2d Cir.1997)).

### (ii) *Application*

■ Accepting, as I must, the material allegations of the first amended complaint to be true for purposes of this motion, I conclude that plaintiffs have stated a viable defamation claim.

First, the statements that Hopkins made to the reporters in question were statements of fact, not opinion. For example, he said to Maxboxing.com: "Understand, every time I fought, Lou DiBella got paid, even when he was with HBO, which is f* *king wrong." (First Am. Compl. at Ex. B). He told the *Boston Globe:* "I got the evidence right here on my coffee table. The wire transfers. The voided check. . . . To get on that [HBO] card the fee was $50,000." (*Id.* at Ex. A). He told the *Las Vegas Review–Journal:* "Lou DiBella . . . lobbied for HBO while he was there. . . . I paid him. I wired him $50,000." (*Id.* at Ex. D).

These were statements of fact. They had a precise and readily understood meaning. They could be proven false. They were not made in contexts that would signal to the reader that they were more likely to be expressions of opinion rather than statements of fact; to the contrary, they were made in contexts that clearly suggested they were statements of fact.

Hopkins now argues that he "did not claim that Mr. DiBella was actually paid before he left HBO" and the "gist" of his statements was "that Mr. DiBella rendered services to him with the expectation of payment while an HBO employee and at a time when he had the authority to decide who would participate in its televised boxing tournaments." (Def. Mem. at 16). This argument is incorrect, as the excerpts quoted above demonstrate. Moreover, the fact that at times Hopkins used rhetorical questions in describing his alleged payments to DiBella does not turn his statements into "conjecture, hypothesis, or speculation." *See Levin*, 119 F.3d at 196. Hopkins was clearly stating that (1) he paid DiBella $50,000 to get his fights on HBO (2) while DiBella was still employed by HBO.

The analyses of Hopkins's remarks in the *New York Daily News* and the *Philadelphia Daily News* confirm the factual nature of Hopkins's statements. (First Am. Compl. at Exs. C, E). One reporter interpreted Hopkins's statements as alleging that DiBella had paid him "payoffs" and "bribes" and the other interpreted Hopkins's statements as alleging that DiBella had "demanded under-the-table fees to secure dates on HBO." *See Belly Basics*, 95 F.Supp.2d at 145–46 (citations omitted). Accordingly, the "mere opinion" defense is rejected.

Second, Hopkins's contention that no defamation lies because his statements were true must be rejected at this point in the proceedings, for the first amended complaint alleges that his statements were false. Indeed, the first amended complaint specifically alleges that DiBella received no monies from Hopkins while he was still employed at HBO. (First Am. Compl. ¶ 14). Because I must assume the facts alleged in the first amended complaint to be true for purposes of this motion, Hopkins's truth defense is premature.

■ The gravamen of a defamation action is injury to reputation, and a defamatory statement is one that exposes an

individual to public hatred, shame, and disgrace "in the minds of right-thinking persons." *Celle v. Filipino Reporter Enter. Inc.*, 209 F.3d 163, 177 (2d Cir.2000) (quoting *Kimmerle v. New York Evening Journal,* 262 N.Y. 99, 102, 186 N.E. 217 (1933)) (further citation omitted). Words that affect a person in his profession, business, or trade by imputing to him fraud or dishonesty are defamatory. *Celle*, 209 F.3d at 180 (citations omitted). Here, Hopkins's statements were defamatory, for he accused DiBella of fraud and dishonesty in his profession, business, and trade. *See Shalaby v. Saudi Arabian Airlines,* No. 97 Civ. 9393(DC), 1998 WL 782021, at *5 (S.D.N.Y. Nov.9, 1998) (plaintiff stated defamation claim where complaint alleged defendants had spread false rumors that he accepted bribes and kickbacks from travel agencies while employed by airline). The motion to dismiss is denied as to the defamation claim.[2]

### c) *Quantum Meruit*

### (i) *Applicable Law*

Plaintiffs also bring a claim for quantum meruit for the reasonable value of services they rendered to Hopkins for which they have not been fully paid. Hopkins moves to dismiss the claim on two grounds. First, he argues that the claim is nothing more than an attempt to "unilaterally renegotiate the amounts [plaintiffs] were paid." (Def. Mem. at 24). Second, he argues that the claim is barred by New York's statute of frauds.

■ To recover in quantum meruit under New York law, a plaintiff must show that he performed services in good faith; the defendant accepted the services; both parties expected that plaintiff would be compensated for the services; and the defendant failed to pay plaintiff reasonable value for the services rendered. *See Longo v. Shore & Reich, Ltd.,* 25 F.3d 94, 98 (2d Cir.1994) (citations and quotations omitted). Under New York's statute of frauds:

> a. Every agreement, promise or undertaking is void unless it or some note or memorandum thereof be in writing ... if such agreement, promise or undertaking ... is a contract to pay compensation for services rendered in negotiating ... a business opportunity.
>
> 10.... 'Negotiating' includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. This provision shall apply to a contract implied in fact or in law to pay reasonable compensation.

N.Y. Gen. Oblig. Law § 5–701(a)(10) (McKinney 2001).

### (ii) *Application*

■ The motion to dismiss is denied as to the quantum meruit claim, for plaintiffs have sufficiently pled the cause of action. First, plaintiffs are not merely seeking to renegotiate the amounts they have already been paid. The first amended complaint alleges that defendants provided Hopkins with services beginning in the spring of 2000 and continuing until some time after the Trinidad fight on September 29, 2001—until as late as November 19, 2001,

---

**2.** Hopkins also argues in passing that the first amended complaint fails to sufficiently allege that he acted with actual malice. I disagree. Plaintiffs have alleged that Hopkins knowingly made false statements that would ruin DiBella's reputation in the boxing community. While plaintiffs must ultimately meet the clear and convincing evidence standard on the actual malice issue, *see Corporate Training Unlimited, Inc. v. National Broadcasting Co., Inc.,* 981 F.Supp. 112, 119 (E.D.N.Y.1997), their allegations are sufficient to withstand a 12(b)(6) motion.

when DiBella met with HBO on Hopkins's behalf. (First Am. Compl. at ¶¶ 11–24). While plaintiffs received some payments for these services, plaintiffs contend that they were not fully paid and were not paid the reasonable value of the services they rendered. Hence, plaintiffs have sufficiently alleged the elements of the cause of action: DiBella provided services to Hopkins; Hopkins accepted them; DiBella and Hopkins expected that DiBella would be compensated for the services rendered; and Hopkins did not pay fair value.

▮ Second, Hopkins's reliance on the statute of frauds is rejected, at this juncture. It is true that plaintiffs point to no writings memorializing any agreement between DiBella and Hopkins, and "a party cannot circumvent the statute of frauds by recharacterizing a breach of contract claim as one for quantum meruit." *Paper Corp. of U.S. v. Schoeller Technical Papers, Inc.*, 742 F.Supp. 808, 812 (S.D.N.Y.1990) (citations omitted). But here plaintiffs are not just seeking fees owed for services rendered in "negotiating" a business opportunity, and DiBella alleges that he did more than merely introduce Hopkins to parties to a transaction or assist in the negotiation or consummation of a transaction. N.Y. Gen. Obligitation. Law § 5–701(a)(10) (McKinney 2001).

Rather, as the first amended complaint alleges, plaintiffs are seeking to be paid for other services provided to Hopkins as well, including business and management advice. For example, the first amended complaint alleges that: DiBella "nurtured" Hopkins's career; he "supported Hopkins ..., both financially and otherwise"; he "devoted significant monies and other resources to furthering Hopkins's opportunities as a fighter"; he gave Hopkins advice about which boxers to fight and whether he should enter the middleweight unification tournament; and he had meetings and telephone calls with HBO on behalf of Hopkins. (First Am. Comp. ¶¶ 1, 2, 12, 18, 23). Indeed, according to the first amended complaint, DiBella worked to repair Hopkins's reputation with boxing professionals who had come to regard Hopkins as an unpromotable and unmanageable fighter. (*Id.* at ¶ 1, 12).

Accordingly, the statute of frauds defense is rejected at this point in the litigation and the motion to dismiss is denied as to plaintiffs' quantum meruit claim.

### B. *Plaintiffs' Cross–Motion*

Plaintiffs' cross-motion for leave to amend the first amended complaint is granted, for leave to amend is to be "freely given when justice so requires." Fed. R.Civ.P. 15(a). Plaintiffs seek to add as a basis for their defamation claim Hopkins's statements made during the radio interview on February 1, 2002. The statements are similar to those already at issue in this case and thus the legal and factual issues will be similar to those already before the Court. The case is at an early stage of the litigation. The proposed amendment will not delay the case. Hopkins has pointed to no prejudice that would result from the granting of leave to amend. Accordingly, the cross-motion is granted and plaintiffs may file the proposed second amended complaint.

### CONCLUSION

For the reasons set forth above, defendant's motion to dismiss is denied and plaintiffs' cross-motion for leave to amend the first amended complaint is granted. Plaintiffs shall file their second amended complaint by March 13, 2002, and Hopkins shall file an answer to the second amended complaint on or before March 27, 2002.

SO ORDERED.